# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JORDAIN CHAMBERS,

     Plaintiff,

v.                          Case No.: 8:20-cv-2794

CITY OF LAKELAND,

     Defendant.

_____/

## **DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT**

Defendant, by and through the undersigned counsel and pursuant to Federal Rule of Civil Procedure 56, moves for final summary judgment in Defendant's favor on all Counts of Plaintiff's Amended Complaint (Dkt. 11).

## STATEMENT OF MATERIAL FACTS

1.     Plaintiff was a patrol officer at Lakeland Police Department ("LPD") and was a member of the Southeast Division of the Alpha Squad. Alpha Squad fell under the command of Lt. Mike Lewis. Exhibit "A-1" at 466. As of July 23, 2019, the Southeast Division of the Alpha Squad fell under the command of Sgt. Jeff Gary, and consisted of Ofc. Edwin Sanchez, Plaintiff, Ofc. Seth Balser, and PSA Julie Raebig. *Id.* at 466. As of July 23, 2019, Sgt. James Roberts was the commanding officer of the Southwest Division of the Alpha Squad. *Id.* at 466; Exhibit "B" ¶ 4.

2.     LPD   General   Orders   govern   the   conduct   of   all   LPD officers/employees, including Plaintiff and said orders include "neglect of duty" and "insubordination". Exhibit "A" ¶ 4.

## I.     Plaintiff's Workplace Harassment Complaint v. Sgt. Roberts

3.     On September 20, 2019, Plaintiff submitted an Employee Incident Report against Sgt. Roberts ("EIR 19-050"). Exhibit "A-5" at 4-11. Plaintiff alleged that she had been "treated unfairly due to my gender and position within the department" and that "I am continuously given extra work assignments, verbally humiliated, and singled out in a public manner while conducting my work duties." Exhibit "A-5" at 3. EIR 19-050 alleged the following incidents:

### a. June 11, 2019 Narcotics Investigation

4.     On June 11, 2019, Plaintiff had asked Communications that she be dispatched to a narcotics call for which she had provided certain intel. Exhibit "A-5" at 3, 125. Plaintiff had not discussed this request with Sgt. Roberts, nor had Sgt. Roberts heard that any of the investigating officers had requested Plaintiff assist in that investigation. *Id.* at 549 ln. 364-68; Exhibit "B". Sgt. Roberts asked over the radio why Plaintiff had placed herself on the call, and whether she was responding to conduct a search of a female suspect; the most common reason for Plaintiff to respond to the call. *Id.* ¶ 5; Exhibit "A-5" at 125-26 ln. 80-91. Plaintiff responded that "property is intel I gave them." Exhibit "A-5" at 126 ln. 93. Plaintiff was not disciplined now the encounter documented.

### b. June 14, 2019 Domestic Violence Dispatch and Meeting

5.      On June 14, 2019, Plaintiff began her shift at 10:00 a.m. broadcasting that she was out working on reports and subject to call. Exhibit "A-5" at 155 ln. 15; Exhibit "B" ¶ 6. At 10:44 a.m., Ofc. David Kaiser was dispatched to a domestic violence complaint. Exhibit "A-5" at 174, 161 ln. 287-296; Exhibit "B" ¶ 6. Sgt. Roberts reassigned the dispatch to Plaintiff. Exhibit "A-5" at 162 ln. 304-316; Exhibit "B" ¶ 6. The reason was Ofc. Kaiser had already responded to numerous calls, whereas Plaintiff had just come on shift. Exhibit "B" ¶¶ 6-8; Exhibit "A-5" at 18. Plaintiff sent Sgt. Roberts a text message saying "Sir, I'm down reports and he's [Ofc. Kaiser] not." Exhibit "A-5" at 18; Exhibit "B" ¶ 7. Sgt. Roberts responded "He's been answering calls all morning. You need better time management." Exhibit "A-5" at 18; Exhibit "B" ¶ 7. Plaintiff then responded, "Excuse me, but …" and then explaining why she was behind on her reports. Exhibit "A-5" at 18; Exhibit "B" ¶ 7. Sgt. Roberts instructed Plaintiff to come meet him at the station. Exhibit "A-5" at 162 ln. 340-344; Exhibit "B" ¶ 7.

6.      Plaintiff met with Sgt. Roberts and Sgt. Gary. Exhibit "B" ¶ 9; Exhibit "C" ¶ 4. Sgt. Roberts informed Plaintiff that he wanted to give her the benefit of the doubt and asked if the words "excuse me" were intended to be professional or sarcastic. Exhibit "B" ¶ 9; *see* Exhibit "C" ¶ 5. Plaintiff replied that it was sarcastic slang and was how things were done up north. Exhibit "B" ¶ 9. Sgt. Roberts asked Plaintiff about being behind on her reports, to which Plaintiff replied that Sgt. Doug Mills, her officer in command in the evening hours, had instructed her to

broadcast that she was out working on reports and subject to call and to work on the reports immediately. Exhibit "B" ¶ 9. Sgt. Mills lacked authority to instruct Plaintiff 's work on Sgt. Roberts' shift. Exhibit "B" ¶ 9.

7.      Sgt. Roberts and Sgt. Gary raised concerns with Plaintiff about her ability to work calls without supervision, as she would call her supervisors on almost every job with questions related to completing basic job tasks. Exhibit "B" ¶ 10; Exhibit "C" ¶¶ 6-7. Sgt. Roberts and Sgt. Gary were aware that Plaintiff had received an injury during training and had failed to complete the same. Exhibit "B" ¶ 10; Exhibit "C" ¶ 8. Sgt. Gary, in an attempt to help Plaintiff, offered limited re-training, but Plaintiff declined. Exhibit "C" ¶¶ 9-10. Sgt. Roberts asked Plaintiff whether she felt she had been adequately trained, and Plaintiff replied in the affirmative. Exhibit "B" ¶ 10. Sgt. Roberts advised Plaintiff to provide possible solutions before calling with questions; the goal for Plaintiff to work through her calls and become a problem-solver. Exhibit "B" ¶ 10. The meeting was professional and within the duties and responsibilities of a Sergeant of the LPD. Exhibit "B" ¶ 10; Exhibit "C" ¶ 11. Plaintiff was not disciplined, nor the meeting documented.

### c.  Electronic Subpoena Verbal Counseling

8.      On June 28, 2019, Sgt. Roberts was contacted by Evelyn Berrazueta, a secretary in the Uniform Patrol Division, regarding Plaintiff failing to respond to five electronic witness subpoenas from February 11 to May 28, 2019. Exhibit "B" ¶ 11; Exhibit "A-5" at 179-80, 215-223, 234. Sgt. Roberts counseled Plaintiff, informed Plaintiff of the relevant General Orders, and provided Plaintiff with

copies thereof. Exhibit "B" ¶ 11. Sgt. Roberts also asked Plaintiff why she was working the "10-10 shift" (10 a.m. to 10 p.m.) as a form of small-talk. Exhibit "B" ¶ 12; Exhibit "A-5" at 553-554 ln. 547-65. Sgt. Roberts was curious as to why Plaintiff would want to work the 10-10 shift, which at the time was considered an undesirable shift to work. Exhibit "B" ¶ 12.

### d. July 13, 2019 Child Abuse Call

9.      On July 13, 2019, Sgt. Roberts reassigned a call for service on a child abuse investigation from Ofc. Balser to Plaintiff. Exhibit "A-5" at 251 ln. 1-31; Exhibit "B" ¶ 13. Sgt. Roberts did so because: (1) Ofc. Balser's shift ending at 6:00 p.m. and Sgt. Roberts did not want to pay overtime when there were two shift officers available (Plaintiff and Ofc. Sanchez); (2) the only other relief shift officer besides Plaintiff and Sanchez were off due to a military drill; (3) the two officers that normally covered the area were unavailable: one was off on vacation, and the other was off sick; and (4) between the two remaining choices, Sgt. Roberts assigned the call to Plaintiff instead of Ofc. Sanchez because Ofc. Sanchez had worked *seven* calls for service whereas Plaintiff had only worked *one* call for service.

### e. September 3, 2019 Shoplifting Call Back-Up

10.      On September 3, 2019, Plaintiff responded to a shoplifting complaint as back-up for Ofc. Christopher Bolen because the suspect in custody was female. Exhibit "A-5" at 268, 272 ln. 1-13; Exhibit "B" ¶ 14. After Plaintiff had been on scene for an hour, Sgt. Roberts asked Ofc. Bolen whether Plaintiff was still needed there.

Exhibit "A-5" at 287 ln. 658-665; Exhibit "B" ¶ 14. Exhibit "B" ¶ 14. Ofc. Bolen advised that Plaintiff would be leaving in approximately 10 minutes. Exhibit "A-5" at 287 ln. 664-65; Exhibit "B" ¶ 14. Plaintiff was not disciplined nor the encounter documented.

### f.  September 3, 2019 Radio Communications

11.     On September 3, 2019, Plaintiff advised Communications that she was busy writing reports at the station. Exhibit "A-5" at 293 ln. 5-6; Exhibit "B" ¶ 15. Sgt. Roberts asked Plaintiff for her status, to which Plaintiff replied that she was busy on reports. Exhibit "A-5" at 301 ln. 368-78; Exhibit "B" ¶ 15. Plaintiff then asked Communications to change her status to "out of service, subject to call – on reports." Exhibit "A-5" at 302 ln. 388-90; Exhibit "B" ¶ 15. Because CAD showed Plaintiff as at the station, Sgt. Roberts asked Plaintiff whether she was still at the station, and Plaintiff replied in the negative. Exhibit "A-5" at 312 ln. 830-36. Sgt. Roberts then asked whether Plaintiff had advised Communications that she was in service, to which Plaintiff replied that she advised Communications she was out of service. Exhibit "A-5" at 312 ln. 837-40. Sgt. Roberts checked Plaintiff's GPS and saw that she was not at the station. Exhibit "B" ¶ 15. Sgt. Roberts then asked Plaintiff whether she had advised Communications that she had left the station. Exhibit "A-5" at 318; Exhibit "B" ¶ 15. Plaintiff replied that, while she was at the station dropping off paperwork, she had advised Communications to show her as out of service, not in the station. Exhibit "A-5" at 318. Plaintiff was not disciplined nor the encounter documented.

### g. September 9, 2019 Vehicle Accident

12.     On September 8, 2019, Sgt. Roberts reassigned a vehicle accident investigation in the Southeast District from Ofc. Kaiser to Plaintiff. Exhibit "A-5" at 340 ln. 88-90; Exhibit "B" ¶ 16. Sgt. Roberts did so because: (1) he and Sgt. Gary had agreed months prior to the following protocol for managing the south districts: first, officers were responsible for their zones, and second, officers were responsible for their district; (2) Ofc. Kaiser was assigned to the Southwest District; and (3) Ofc. Chambers was the only available unit in the Southeast District at the time. Exhibit "B" ¶ 16.

13.     Plaintiff's gender discrimination complaint did not allege that Sgt. Roberts or Sgt. Gary asked "why do you wear your hair in a bun" and "do you even brush your hair" (Dkt. 11 ¶ 20); that Sgt. Roberts commented that Plaintiff was "always crying" "because she is sensitive." (Dkt. 11 ¶ 51); or that she suffered any "micro-aggressions" (Dkt. 11 ¶ 115).

14.     When Chambers filed EIR 19-050, Sgt. Robert was reassigned to the Northeast District, removing him from Plaintiff's chain of command. Exhibit "B" ¶ 4; Exhibit "D" ¶ 8; Exhibit "A" ¶ 14. Sgt. Deas was consequently reassigned to the Southwest District. Exhibit "D" ¶ 8. The reassignment followed protocol for complaints of gender discrimination. Exhibit "A" ¶ 14.

15.     On September 23, 2019, Chief of Police Ruben Garcia ordered that the Office of Professional Standards ("OPS") conduct an investigation into Plaintiff's allegations. Exhibit "A-5" at 5; Exhibit "A" ¶ 13. The investigation was assigned to

Det. Stephanie Burcham. Exhibit "A-5" at 5. Det. Burcham, with the assistance of Det. Paula Parker, conducted the investigation. Exhibit "A-5" at 43-87; Exhibit "E" ¶ 4. The OPS directive is to investigate employee incident reports with impartiality. Exhibit "A" ¶ 10. Det. Burcham was a disinterested investigator with no involvement in the events that formed the basis of the investigation. Det. Burcham gathered documents and conducted twenty-two interviews of various officers involved, including Plaintiff, Sgt. Roberts, and twenty witnesses. Exhibit "A-5" at 76-79. Det. Burcham concluded Investigation EIR 19-050 on January 29, 2020. *Id.* at 87.

16.     Sgt. Sealey reviewed the above and authored a 20-page memorandum to Chief Garcia, Assistant Chief Rick Taylor, and Capt. Ron Bowling dated February 16, 2020. Exhibit "A-5" at 90-110; Exhibit "F" ¶¶ 7-8. Sgt. Sealey summarized the facts of the case and the relevant General Orders, and determined that "Sergeant James Roberts acted properly and well within department policy and his duty as a sergeant with the Lakeland Police Department" and that Plaintiff's allegations against Sgt. Roberts were "unfounded."[1] *Id.* at 110. Sgt. Sealey particularly relied on the following facts:

> a.     All of the members interviewed who had direct involvement or knowledge of the alleged incidents testified that "they did not observe or believe Sergeant Roberts singled out or acted any different to Officer Chambers than he would anyone else on the squad." *Id.* at 108.

---

[1] The term "unfounded" in this context means "Allegation is false or not based on valid facts." Exhibit "A-5" at 111, 114; Exhibit "A" ¶ 15. If there were "insufficient evidence to prove or disprove the allegation," the determination would have instead been "not sustained." Exhibit "A-5" at 111, 114; Exhibit "A" ¶ 24.

b.      Several members with direct involvement or knowledge described "Officer Chambers' work as slow and avoiding calls" and testified that "they themselves went to Sgt. Roberts and complained on her 'milkin' calls." *Id.* at 108.

c.      Ofc. Rivera testified that Plaintiff "struggles with being told what to do" and has issues with "following the chain of command." *Id.* at 108.

d.      The only officers who commented to Plaintiff about the LPD radio traffic "had no knowledge of the specific details to the communication between Roberts and Chambers," and thus "were only verbalizing their opinion and making an assumption of a situation they knew nothing about." *Id.* at 109.

e.      Sgt. Roberts testified that "he treats all members working under him the same" and that not only did his treatment of Officer Chambers not violate department policy, but that he was in fact following department policy by fulfilling his responsibilities and duties as her supervisor." *Id.* at 109.

f.      Sgt. Roberts' commanding officers, Lt. Mike Lewis and Acting Lt. Tye Thompson, "testified to never witnessing Sgt. Roberts act outside of his duties as a sergeant." *Id.* at 109. Sgt. Jeff Gary, who works the same district as Sgt. Roberts and was Plaintiff's supervisor prior to Sgt. Roberts, testified similarly and added that he "observed and was told of the same behavior of Officer Chambers from other members on the squad." *Id.* at 109.

17.     Per procedure, Cpt. Bowling, Asst. Chief Taylor, and Chief Garcia each reviewed the file and concurred with Sgt. Sealey's determination that Plaintiff's complaint was unfounded. Exhibit "A-5" at 112-14; Exhibit "A" ¶ 15.

## II.     Plaintiff's Violations of General Orders 3-1.2 and 3-1.4 (EIR 19-051)

18.     On September 25, 2019, Sgt. Roberts conducted a briefing to Alpha Squad members ordering that "members were to avoid coming into the station

unless work-related or to use restroom," and "to stay out of the Communications center and not to bring food, drinks, etc. to dispatchers." Exhibit "A-6" at 198; Exhibit "B" ¶ 18; Exhibit "C" ¶¶ 13-14; Exhibit "G" ¶ 4; Exhibit "H" ¶¶ 12-13. Plaintiff was present at the briefing and heard Sgt. Roberts' orders. Exhibit "A-6" at 183, 185, 198; Exhibit "B" ¶ 18; Exhibit "H" ¶ 14.

19.    On October 6, 2019, Sgt. Thompson told Sgt. Gary that he had just seen Plaintiff walking away from Communications. Exhibit "A-6" at 5; Exhibit "C" ¶ 15; Exhibit "H" ¶ 15. Sgt. Gary learned from Communications Specialist Sandra Murphy that Plaintiff had in fact had been in Communications Center to deliver donuts. Exhibit "A-6" at 5; Exhibit "C" ¶ 15. On October 7, 2019, Sgt. Gary submitted a sworn Employee Incident Report ("EIR 19-051") for neglect of duty and insubordination. Exhibit "A-6" at 4-6, 27; Exhibit "C" ¶ 16; Exhibit "E" ¶ 5; Exhibit "H" ¶ 16. Sgt. Roberts, Sgt. Deas and/or Sgt. Sealey were not in any way involved in Sgt. Gary filing EIR 19-051. Exhibit "C" ¶¶ 16-17; Exhibit "B" ¶ 19; Exhibit "D" ¶ 14.

20.    Chief Garcia ordered an investigation. Exhibit "A-6" at 6, 27; Exhibit "A" ¶ 18. Det. Parker, with the assistance of Det. Burcham, conducted the investigation. Exhibit "A-6" at 27-41; Exhibit "E" ¶ 5. Det. Parker and Det. Burcham were disinterested investigators who had no involvement in the events that formed the basis of EIR 19-051. Exhibit "E" ¶¶ 6, 9-10. Det. Parker gathered documents and conducted eleven new interviews with various officers involved, including Plaintiff, Sgt. Gary, and nine witnesses. Exhibit "A-6" at 35-36. Critically, Plaintiff

admitted that she brought donuts into the Communications Center after Sgt. Roberts told her and others in the September 25 briefing that food and drink should not be brought to Communications. Exhibit "A-6" at 183, 185, 198. Plaintiff did not think Sgt. Roberts's statement was a direct order and she wanted to create a rapport with Dispatch. *Id.* at 198 ln. 157-164.

21.     On March 2, 2020, after reviewing Plaintiff's alleged violations for neglect of duty and insubordination, Sgt. Fetz found that Plaintiff had in fact committed the infraction and recommended a 58.8hour (7-day) suspension. Exhibit "A-6" at 42. Sgt. Fetz was from a completely different chain of command than Plaintiff, Sgt. Roberts, Sgt. Gary, or Sgt. Deas. Exhibit "A" ¶ 19. On March 3, 2020, Lt. Douglas Brown reviewed Sgt. Fetz's recommendations and agreed with the findings. Exhibit "A-6" at 43-44. In particular, Lt. Brown noted that:

> Officer Chambers' actions were a blatant disregard to Sergeant Roberts' authority as a supervisor in the Lakeland Police Department. I also feel her being several miles outside of her assigned patrol zone to run errands for the communications center was at minimum neglectful. In the event that a high priority call was to come out, she would have several factors associated with leaving the communications center and arriving to an event location that could cause a significant delay in her response time.

*Id.* at 43. Lt. Brown disagreed as to the duration of probation, and instead recommended a 42-hour (5-day) suspension. *Id.* at 44. On March 5, 2020, Cpt. Bowling reviewed and concurred with Lt. Brown's analysis recommending a 42-hour (5-day) suspension. Exhibit "A-6" at 46. On March 10, 2020, Asst. Chief Taylor concurred with Sgt. Fetz's conclusion but recommended a 6-day

suspension. *Id*. at 46. On April 8, 2020, Chief Garcia concurred with the results of the investigation, sustained Plaintiff's violations and found that a 6-day suspension was proper. *Id*. at 47; Exhibit "A" ¶ 20. Although these violations justified dismissal from employment, Chief Garcia decided a 6-day suspension was the lowest reasonable level of discipline to obtain correction. Exhibit "A" ¶ 20. This sanction was consistent with sanctions of other officers, regardless of gender, who had committed similar violations. Exhibit "A" ¶ 20. Chief Garcia's recommendations were not based in any way on Plaintiff's sex or gender. Exhibit "A" ¶ 20. On April 13, 2020, Defendant suspended Plaintiff for 50.4 hours for the violations of General Orders 3-1.2 and 3-1.4. Exhibit "A-6" at 49-50.

### III. Sgt. Roberts' Workplace Complaint v. Plaintiff (EIR 20-015)

22.    On March 13, 2020, Sgt. Roberts brought a formal complaint against Plaintiff, alleging that Plaintiff's EIR 19-050 was reckless, frivolous, and based on invalid facts, and that Plaintiff had violated various General Orders for filing it. Exhibit "A-7" at 5-16; Exhibit "A" ¶ 23; *see* Exhibit "B" ¶ 20. Sgt. Robert's charges against Plaintiff were "not sustained." Exhibit "A-7" at 60-62, 64; Exhibit "A" ¶¶ 24-25. Of note, Lt. Shawn Collins reviewed the initial findings and stated "While opinions may vary regarding whether or not the initial complaint [EIR 19-050] was frivolous, it does not rise to the level of intent." *Id*. at 63.

### IV.    The Instant Action

23.    Plaintiff's Amended Complaint (Dkt. 11), raises three counts against Defendant: (I) employment discrimination on the basis of gender; (II) hostile work

environment harassment on the basis of gender; and (III) discriminatory retaliation. (Dkt. 11). Plaintiff alleges three adverse employment actions: (1) Defendant "suspended Plaintiff without pay in April 2020"; (2) Defendant "prevented her from transferring squads so she could get away from Sgt. Roberts"; and (3) Defendant "placed Plaintiff on probation." (Dkt. 11 ¶¶ 118-120).

24.     Defendant's affirmative defenses include it acted in good faith and had reasonable grounds for its employment actions; all employment actions were based on legitimate, non-discriminatory reasons; the conduct complained of was not severe or pervasive enough to alter the terms and conditions of Plaintiff's employment or to create a hostile or abuse working environment; the conduct complained of was not so frequent, severe, or physically threatening or humiliating to constitute actual harassment under Title VII, and did not unreasonably interfere with Plaintiff's job performance; the conduct complained of was entirely gender-neutral; none of the conduct complained of that occurred before EIR 19-050 can form the basis for a discriminatory retaliation claim; and Defendant promptly, fully, and fairly reviewed EIR 19-050 and found it had no merit. (Dkt. 22 at 12-15).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues as to any material fact when the evidence is viewed in the light most favorable to the nonmovant. *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 656 (11th Cir. 1983). After successfully discharging its initial burden of showing a lack of material issues of fact, the burden shifts to the nonmovant to establish, with evidence beyond the

pleadings, that there is an issue material to the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmovant must present "affirmative evidence" of material factual conflicts to defeat a motion for summary judgment that is properly supported. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 257 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If the nonmovant's response to the motion for summary judgment consists of nothing more than conclusory allegations, the court must enter summary judgment.

**ARGUMENT**

## I.    Plaintiff's Claim for Gender-Based Disparate Treatment (Count I)

Plaintiff pleads her action for gender discrimination as one of disparate treatment. (Dkt. 11 ¶ 25) Disparate treatment claims follow 42 U.S.C. § 2000e-2(a)(1). Plaintiff must prove intentional discrimination her on the basis of a protected characteristic. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). The question is "whether the protected trait *actually motivated* the employer's decision." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003) (*emphasis* added). "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998). "Title VII is not designed to make

federal courts 'sit as a super-personnel department that reexamines an entity's business decisions.'" *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001). "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).

Plaintiff alleges that Defendant took the following discriminatory actions on the basis of her gender: (1) "assigned her additional work duties;" (2) "refused to investigate Plaintiff's complaints of harassment" against Sgt. Roberts; and (3) "suspend[ed] Plaintiff and prevent[ed] her from transferring to another squad." (Dkt. 11 ¶¶ 134, 135, 138).

First, the record is clear that Plaintiff was not assigned extra work because of her gender. For the June 14, 2019 Domestic Violence Dispatch, Sgt. Roberts assigned Plaintiff the call because the other officers had already worked multiple calls that morning and he did not know that Plaintiff was behind on reports. For the September 9, 2019 Vehicle Accident, Sgt. Roberts assigned Plaintiff to respond to the accident because the accident occurred in the Southeast Division and Plaintiff was the only Southeast unit available. In each case, the only permissible inference from the record evidence is that the work assignments were based entirely on work-related factors and not in any way on Plaintiff's gender.

Second, Defendant did not refuse to investigate Plaintiff's gender discrimination complaint. The 669-page investigation file directly contradicts this.

Exhibit "A-5". It is evident from the face of that investigation file that Defendant took that complaint seriously. Investigation 19-050 went through four levels of review (Sgt. Sealey, Capt. Bowling, Asst. Chief Taylor, and Chief Garcia), with Chief Garcia ultimately signing off on the Recommended Action Form. Plaintiff's allegation that Defendant refused to investigate EIR 19-050 is entirely baseless.

Finally, there is no summary judgment evidence in the record that Plaintiff's protected status as a woman had anything to do with her suspension. All of the summary judgment evidence proves the contrary. During the 10:00 a.m. briefing on September 25, 2019, Sgt. Roberts ordered all officers, including Plaintiff, to refrain from bringing food or drink to Communications. Plaintiff admits that she heard Sgt. Roberts' order. Plaintiff disobeyed this order on October 6, 2019 when, as she admits, she brought donuts to Communications. Furthermore, Plaintiff was "several miles outside of her assigned patrol zone to run errands for the communications center," which Lt. Brown noted "was at minimum neglectful." Accordingly, Plaintiff violated a direct order of her supervisor and thus committed neglect of duty and insubordination. Each of Sgt. Fetz, Lt. Brown, Capt. Bowling, Asst. Chief Taylor, and Chief Garcia reviewed the charges against Plaintiff, found that she had disobeyed a direct order, and as a result violated General Orders 3-1.2 and 3-1.4. Not once in the investigation was Plaintiff's gender mentioned, and each of Sgt. Fetz, Lt. Brown, Capt. Bowling, Asst. Chief Taylor, and Chief Garcia have sworn that they did not consider Plaintiff's gender in the course of the investigation, reviews, or discipline. Sgt. Fetz was not in Plaintiff's chain of

command and all five levels of the review were entirely gender-neutral, and so Plaintiff's gender could not possibly have been a motivating factor.

## II.  Plaintiff's Claim for Hostile Work Environment Harassment (Count II)

To prevail in her claim for hostile work environment harassment, Plaintiff must prove that (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her membership in the protected group; (4) the harassment was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) Defendant, as the employer, is responsible for that environment under either a theory of vicarious or of direct liability. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012).

Regarding the fourth element, harassment is only sufficiently severe and pervasive if a reasonable person would perceive the working environment to be hostile or abusive: i.e., the workplace is "permeated with discriminatory intimidation, ridicule, and insult." *Id.* at 1299;. This objective determination consists of four main factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. Harassment does not include "simple teasing, offhand comments, and isolated incidents (unless extremely serious)," as those "will not amount to discriminatory changes in the

'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[P]roving a hostile work environment is a heavy burden—one that cannot be met merely by showing unprofessional encounters and harshly worded emails." *Elite Amenities, Inc. v. Julington Creek Plantation Cmty. Dev. Dist.*, 784 F. App'x 750, 752 (11th Cir. 2019).

Plaintiff alleges eight incidents which she considers to be actionable harassment: (1) Sgt. Roberts told Plaintiff she was not working fast enough, but did not tell her male coworkers the same (Dkt. 11 ¶¶ 18-19, 26, 38); (2) Sgt. Roberts asked dispatch to hold extra calls for Plaintiff, but not for Plaintiff's male coworkers (*Id.* ¶¶ 21-22, 26, 60, 62, 134); (3) Sgt. Roberts and Ofc. Gary made various comments about Plaintiff's hair, but did not make similar comments regarding Plaintiff's male coworkers (*Id.* ¶¶ 20, 45, 53-54, 56-57); (4) Sgt. Roberts made comments about Plaintiff over the radio (*Id.* ¶¶ 23, 99); (5) Sgt. Roberts commented that Plaintiff was "busy doing 'female searches,' " but did not make comparable comments about Plaintiff's male coworkers (*Id.* ¶¶ 23, 60, 99); (6) Sgt. Roberts humiliated Plaintiff in a 2019 shift briefing (*Id.* ¶¶ 30-37); (7) Sgt. Roberts filed a complaint against her for "failure to follow a direct order" (*Id.* ¶ 71); and (8) Sgt. Roberts commented that Plaintiff was "always crying" "because she is sensitive" (*Id.* ¶¶ 50-52, 54, 58). Defendant discusses each and shows that, in light of the record evidence, Plaintiff cannot prove that she was subjected to unwelcome harassment; that the harassment complained of was based on her membership in the protected group; or that the harassment was severe or pervasive enough to alter

the terms and conditions of employment and create a hostile or abusive working environment.

### a. Comments That Plaintiff Was Not Working Fast Enough (Dkt. 11 ¶¶ 18-19, 26, 38)

Sgt. Roberts is directly responsible for the performance of personnel under his immediate control, including Plaintiff. It goes without need of citation that, if a supervisor notices that a subordinate is working slowly, the supervisor should address that with the subordinate. That is exactly what occurred in the instant case. There is no record evidence that these comments were in any way based on Plaintiff's gender, nor that these comments were so severe and pervasive to the point of materially altering the terms and conditions of Plaintiff's employment. In fact, other than the electronic subpoenas Plaintiff did not timely respond to, none of Plaintiff's complaints resulted in any write-up; the electronic subpoenas were not initiated by Sgt. Roberts.

### b. Extra Calls for Plaintiff (Dkt. 11 ¶¶ 21-22, 26, 60, 62, 134)

Plaintiff's allegation that Sgt. Roberts harassed her by assigning her more work is without merit. As explained in Section I, the calls Plaintiff takes issue with were work-related and not based on her gender.

### c. Comments About Hair and Appearance (Dkt. 11 ¶¶ 20, 45, 53-54, 56-57)

Plaintiff hinges all her discrimination accusations regarding hair and appearance on alleged questions "why do you wear your hair in a bun" and "do you even brush your hair" by Sgt. Roberts and/or "Officer" [sic] Gary (Dkt. 11 ¶ 20).

19

These allegations find no support in the record evidence. In fact, Sgt. Roberts and Sgt. Gary swear to the opposite effect, nor have Sgt. Deas or Ofc. Mackey heard any such statement. Exhibit "B" ¶ 21; Exhibit "C" ¶¶ 18-19; Exhibit "D" ¶ 12; Exhibit "G" ¶ 6. Even if there were evidence that such comments had been made, those comments are not actionable because they are not so severe and pervasive as to alter the terms and conditions of employment. A reasonable person would not perceive the working environment to be hostile or abusive based on two isolated questions concerning Plaintiff's hairstyle or appearance. This is especially true considering that the working environment in this case is a law enforcement agency which employs uniformed law enforcement officers such as Plaintiff. (Dkt. 11 ¶ 6); Exhibit "A" ¶ 3; *see generally Eiland v. City of Montgomery*, 797 F.2d 953, 959 (11th Cir. 1986) ("This concern is associated with the paramilitary nature of a police department and the need to preserve departmental respect and discipline.").

### d. Comments Over the Radio (Dkt. 11 ¶¶ 23, 99)

The only comment that Plaintiff alleges is Sgt. Roberts' commenting that Plaintiff "couldn't complete excess job assignments because she was busy doing female strip searches." (Dkt. 11 ¶¶ 23, 99). In reality, Sgt. Roberts had asked why Plaintiff was responding to a call he had not assigned her to and whether it was for a female strip search; a legitimate reason for Plaintiff to respond to a call. There is no record evidence supporting Plaintiff's assertion that this mischaracterized comment created conditions so severe and pervasive to the point of materially altering the terms and conditions of her employment.

20

### e.  Comments About "Female Searches" (Dkt. 11 ¶¶ 23, 60, 99)

Florida law places various requirements on strip searches by law enforcement officers, including that a strip search may only be conducted on an arrestee and by a person of the same gender as the arrestee. § 901.211(1), (3), Fla. Stat. Plaintiff was the only female in Sgt. Roberts' squad, so Plaintiff was the only individual who could lawfully conduct any strip searches of female arrestees that needed to be performed by Sgt. Roberts' squad. If Defendant were to allow a male officer to conduct strip searches of female arrestees, the same would be in direct violation of § 901.211(3), Florida Statutes, and arguably in violation of the arrestee's right to be free from unreasonable searches pursuant to the Fourth Amendment to the United States Constitution. Plaintiff cannot state a claim for hostile work environment harassment on the basis Defendant required Plaintiff to conduct "female searches" unless following Florida law constitutes harassment under Title VII.

### f.  July 2019 Briefing (Dkt. 11 ¶¶ 30-37)

Plaintiff alleges that sometime during a shift briefing in July of 2019, "Sgt. Roberts told the entire squad that he was filing a complaint against Plaintiff for failure to follow a direct order" and "accused Plaintiff of being in the police station when she was not supposed to be." (Dkt. 11 ¶¶ 32-33). Even if such comments had been made, there is no record evidence that these comments were based in any way on Plaintiff's gender. In fact, these fictional comments are, on their face, strictly related to Plaintiff's on-the-job conduct, not her gender. Furthermore, there is no

record evidence that these comments were severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment. Lastly St. Roberts did not file the Complaint she alleges despite that she did fail to follow a direct order.

### g. Sgt. Roberts' 20-015 Complaint (Dkt. 11 ¶ 71)

Plaintiff claims that Sgt. Roberts harassed her when he filed the 20-015 Complaint. (Dkt. 11 ¶ 71). A cursory review of the 20-015 Investigation shows otherwise. *See* Exhibit "A-7". Unlike Plaintiff's harassment allegations in EIR 19-050, which were determined to be "unfounded," the 20-015 Complaint had at least some merit, as reflected in the reviewing lieutenant note that "opinions may vary regarding whether or not the initial complaint [EIR 19-050] was frivolous" and in the ultimate determination of "not sustained" (as opposed to "unfounded"). Exhibit "A-7" at 60-62, 64. Furthermore, there is no record evidence that the 20-015 Complaint was harassment at all, let alone harassment severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment. Sgt. Roberts had a right under the policy to file the complaint and the 20-015 charges were "not sustained," so Plaintiff was not disciplined.

### h. Comments About Crying and Sensitivity (Dkt. 11 ¶¶ 50-52, 54, 58)

Plaintiff alleges that Sgt. Roberts commented that Plaintiff was "always crying" "because she is sensitive." (Dkt. 11 ¶ 51). There is no record evidence of this,

and Sgt. Roberts has sworn that no such comments were made, nor have Sgt. Gary, Sgt. Deas, or Ofc. Mackey heard Sgt. Roberts make such a statement. Exhibit "B" ¶ 21; Exhibit "C" ¶ 19; Exhibit "D" ¶ 12; Exhibit "G" ¶ 6. Even if such comments had been made, there is no record evidence that these comments were based in any way on Plaintiff's gender or that they were severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment.

### i. Alleged Microaggressions (Dkt. 11 ¶ 115)

Finally, insofar as Plaintiff cites unspecified "micro-aggressions" (Dkt. 11 ¶ 115) as a basis for any of her claims, the same lack the severity required to sustain a hostile work environment claim under Title VII applies.

> Microaggressive acts often fall outside the scope of Title VII protections. That is because when an employee is harassed by fellow workers or by management, protections are only triggered if such harassment is severe enough to create a work environment that is pervasively hostile, and appears as such to an ostensibly "neutral" and fictional "reasonable person." ... Microaggressive acts such as occasional snide comments, eye-rolling, or heavy sighing, for example, are not constitutive of a "hostile work environment," unless they are part of a wider range of conduct sufficient to constitute a hostile work environment.

Kristina Benson, *THE FREEDOM TO BELIEVE AND THE FREEDOM TO PRACTICE: TITLE VII, MUSLIM WOMEN, AND HIJAB*, 13 UCLA J. Islamic & Near E. L. 1, 16-17 (2014); *see also Weinberg v. William Blair & Company, LLC*, No. 12-cv-09846, 2015 WL 5731637, at *6 (N.D. Ill. Sep. 30, 2015) (finding that micro-aggressions were more akin to "mere offensive utterances" than "physically

threatening or humiliating statements," and were thus insufficient to create an actionable hostile work environment claim). Incidents of discrimination this minor cannot form a sufficient basis for a disparate treatment claim or hostile work environment claim. § 42 U.S.C. § 2000e-2(a)(1); *Faragher*, 524 U.S. at 788. Pursuant to *Weinberg* and *Faragher*, Plaintiff cannot state a claim hostile work environment harassment based on unspecified "micro-aggressions."

### III.   Plaintiff's Claim for Discriminatory Retaliation (Count III)

To prevail in her claim for discriminatory retaliation, Plaintiff must first establish a *prima facie* case: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) there is a causal connection between the protected activity and the materially adverse action. *Godwin v. Corizon Health* 731 Fed. App'x 805, 808 (11th Cir. 2018). If Plaintiff manages to establish the *prima facie* case, then the burden shifts to Defendant to proffer a "legitimate, non-discriminatory reason for its actions." *Id.* at 808. If Defendant meets that burden, then the burden once again shifts to Plaintiff to show that this reason is pretextual. *Id.* at 808.

Retaliation claims under Title VII can only be proven "according to traditional principles of but-for causation, not the [motivating factor] test stated in § 2000e-2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 360 (2013). "This is true both ultimately and at the prima facie stage." *Montgomery v.*

24

*Board of Trustees of the Univ. of Ala.*, No. 2:12-CV-2148-WMA, 2015 WL 1893471, at *4 (N.D. Ala. April 27, 2015);

For the protected-activity prong, Plaintiff alleges three protected activities: (1) Plaintiff complained to Lt. Lewis about Sgt. Roberts; (2) Plaintiff filed EIR 19-050 against Sgt. Roberts; and (3) Plaintiff testified against Sgt. Roberts during Investigation 19-050. (*See* Dkt. 11 ¶¶ 169-171). For the adverse employment action prong, Plaintiff alleges (1) her suspension in April 28, 2020; (2) Sgt. Roberts' "complaint(s) against Plaintiff;" (3) Sgt. Roberts' "conduct towards Plaintiff at the [September 25] 2019 squad briefing;" and (4) Sgt Roberts' "continued public harassment and humiliation of Plaintiff (following Plaintiff's complaints about his behavior)." (Dkt. 11 ¶ 172, 174-176). Finally, as to the causation prong, Plaintiff alleges that Sgt. Roberts "retaliated against Plaintiff because she participated in an investigation protected by Title VII and/or opposed conduct that violated Title VII." (Dkt. 11 ¶ 177).

The second, third, and fourth alleged retaliations have already been shown meritless in Sections I and II above, leaving only the first: Plaintiff's suspension. An employee's neglect of duty or insubordination constitutes legitimate, non-retaliatory grounds for suspending that employee. *Johnson v. City of Tampa*, No. 8:11-cv-2372-T-33EAJ, 2013 U.S. Dist. LEXIS 66265 (M.D. Fla. May 9, 2013) ("failure to promptly obey the lawful order of a supervisor as required by the City's insubordination policy constitutes a legitimate, non-retaliatory reason for [plaintiff's] resulting suspension."); *Stewart v. Happy Herman's Cheshire Bridge*,

117 F.3d 1278, 1287 (11th Cir. 1997) ("the district court found that Stewart established a *prima facie* case, but failed to rebut Happy Herman's assertion that it legitimately fired Stewart for insubordination. We agree that Stewart failed to rebut Happy Herman's non-discriminatory explanation for discharging her."); *Godoy v. Habersham County*, 211 Fed. App'x 850, 855 (11th Cir. 2006) ("Even assuming Godoy provided sufficient evidence of a *prima facie* case of retaliation, the Defendants proffered a legitimate nondiscriminatory reason for Godoy's termination -- insubordination."); *Wilson v. Dep't of Children & Families*, No. 3:02-cv-357-J-32MMH, 2006 U.S. Dist LEXIS 1411 at *30 (M.D. Fla. Jan. 10, 2006) (same, but also including disruptive conduct and conduct unbecoming a public employee).

A straightforward review of the facts of Investigation 19-051 reveals that Defendant's grounds for suspending Plaintiff were legitimate, non-retaliatory, and non-pretextual. During the 10:00 a.m. briefing on September 25, 2019, Sgt. Roberts ordered all officers, including Plaintiff, to refrain from bringing food or drink to Communications. Plaintiff admits that she heard Sgt. Roberts' order. Plaintiff disobeyed this order when, as she admits, she brought donuts to Communications. Furthermore, Plaintiff was "several miles outside of her assigned patrol zone to run errands for the communications center," which Lt. Brown noted "was at minimum neglectful." Accordingly, Plaintiff violated a direct order of her supervisor and thus committed neglect of duty and insubordination in violation of General Orders 3-1.2 and 3-1.4. Furthermore, there is simply no evidence of pretext

or ruse in the 19-051 Investigation that could possibly overcome the properly sustained charges of neglect of duty and insubordination.

Accordingly, summary judgment is due in Defendant's favor as to Plaintiff's discriminatory retaliation claim.

## CONCLUSION

WHEREFORE, Defendant, CITY OF LAKELAND, respectfully requests that the Court enter final summary judgment in Defendant's favor on all Counts of Plaintiff's, JORDAIN CHAMBERS, Amended Complaint.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 10th day of January, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to Bernard R. Mazaheri, Esq. at bernie@thelaborfirm.com.

CAMPBELL TROHN
 TAMAYO & ARANDA, P.A.

*/s/ Robert Aranda*
Robert Aranda, Esq.
Florida Bar No. 988324
Edward B. Kerr, Esq.
Florida Bar No. 1018861
1701 South Florida Avenue
Lakeland, FL  33803
Tel.: (863) 686-0043
Fax: (863) 616-1445
r.aranda@cttalaw.com
e.kerr@cttalaw.com
p.roop@cttalaw.com
Counsel for Defendant