## DECLARATION OF JORDAIN CHAMBERS
## PURSUANT TO 28 U.S.C. § 1746

1.      I, Jordain Chambers, make this declaration under oath from personal knowledge.

2.      I began working for the City of Lakeland (COL) in March 2018.

3.      I still work for COL.

4.      I work for COL as a patrol officer in its police department known as the Lakeland Police Department (LPD).

5.      I am currently on medical administrative leave.

6.      I am a female.

7.      All my supervisors have been male.

8.      The officers in my squad are all assigned "zones."

9.      In 2019, I was assigned to work the "Foxtrot Zone," an area encompassing South West Lakeland.

10.     In 2019, I was assigned to alternating shifts – working 2 days per week one week, then 5 days per week the next week, and so on.

11.     In 2019, my shift (10 am to 10 pm) was typically the busiest shift.

1

12.     In a typical shift, the officers in my squad, including myself, would take calls from LPD Dispatch employees originating within our zone.

13.     Sometimes LPD officers would be assigned to calls outside of our work zone if, for example, we were the closest responding officer, or if the officers assigned to the area were unavailable at the time the call came in.

14.     Taking calls outside a zone is the exception, not the rule.

15.     On or about January 2019, Sgt. Chip Roberts became my supervisor.

16.     On or about March 2019, Sgt. Roberts started targeting me because of my gender.

17.     In early 2019 and continuing through the summer, Sgt. Roberts told me I was not working fast enough.

18.     Sgt. Roberts did not tell my male coworkers they were not working fast enough.

19.     In early 2019, Sgt. Roberts and his friend, Officer Gary, made comments about my appearance, for example, asking me "why do you wear your hair in a bun?" and "do you even brush your hair?"

20.     In early 2019 and continuing through the summer, Sgt. Roberts told LPD Dispatch employees to hold a log of "extra calls" for me to work, even though there were other officers available to take the calls and the calls should not have been assigned to me.

21.     Sgt. Roberts did not ask dispatch to hold extra calls for my male coworkers.

22.     From early to mid-2019, Sgt. Roberts made public comments to me and LPD Dispatch employees over the radio suggesting that I was working less and/or slower than my male counterparts and referencing my gender (i.e. asking if I was unable to complete his extra call log because I was busy doing "female searches".)

23.     In mid-2019, LPD Dispatch employees told Sgt. Roberts that he was treating me unfairly by reassigning me extra calls.

24.     Sgt. Roberts ignored the concerns of LPD Dispatch employees related to his disparate treatment of me.

25.     Sgt. Roberts continued treating me differently than my male counterparts through the early summer of 2019, assigning me more and

more calls, intentionally giving me more work and continuing to insist that I work faster than my male coworkers.

26.    In July 2019, I complained to my Lieutenant about Roberts' behavior.

27.    My Lieutenant did nothing to address the complaint. In fact, he treated the complaint like a joke.

28.    Despite my request that he step in to stop the discrimination and harassment, my Lieutenant declined to act, suggesting that I did not have the gall to "take it up the ladder" (meaning complaining higher up the chain of command).

29.    The very next shift, Sgt. Roberts held a briefing and invited all of the squad officers as well as all of the supervisors.

30.    Typically, there is only one supervisor per shift, but Sgt. Roberts made sure all of the squad supervisors were available for this particular briefing.

31.    During the 2019 shift briefing, Sgt. Roberts told the entire squad that he was filing a complaint against me for failure to follow a direct order.

DocuSign Envelope ID: D5751869-3BCC-470C-B871-336877A3169C

32.     During the 2019 shift briefing, Sgt. Roberts accused me of being in the police station when I was not supposed to be.

33.     Sgt. Roberts humiliated me during this meeting.

34.     Sgt. Roberts berated me in front of all of my peers. Even if I had done something wrong the manner in which Sgt. Roberts berated me in front of so many.

35.     Sgt. Roberts berated me because I am female and because I had complained about his discriminatory behavior to his Lieutenant.

36.     Sgt. Roberts berated me during this briefing in front of my peers for the purpose of discouraging me from pursuing my complaints against him and in an effort to interfere with my rights under Title VII.

37.     In the summer of 2019, Sgt. Roberts continued to assign me more work and make comments about my speed, quality of work and "comings and goings" to LPD dispatch employees.

38.     During this same period, Lieutenant Ty Thompson told me I better "keep my head down" to avoid retribution by Sgt. Roberts and his pals.

39.     The harassment got so bad in the summer of 2019 that I started to suffer physically:

    a.  I felt sick in my stomach.

    b.  My diet and sleep patterns were disturbed.

    c.  I felt humiliated while at work.

    d.  I would sometimes feel so worried and sick that I would call out of my shift.

40.     One of my zone partners, Officer Drake Mackey, saw that the harassment at work was negatively affecting my well-being and offered to help me complete the extra calls Sgt. Roberts assigned to me but Officer Mackey was targeted for simply making the offer – receiving negative comments from both Sgt. Roberts and Sgt. Roberts' close friends – Officers Gary and Dees.

41.     Prior to Sgt. Roberts becoming my supervisor, Officers Roberts, Dees and Gary had all served in a SWAT team together.

42.     Although Sgt. Roberts was my supervisor, Roberts, Dees and Gary all acted in concert to terrorize, bully and belittle me on the job.

43.     Roberts, Dees and Gary are all male.

44.     Officers Dees and Gary commented on my appearance at work.

45.     Officers Dees and Gary participated in the harassment of me because Sgt. Roberts encouraged them to do so.

46.     In September 2019, I filed a formal complaint against Sgt. Roberts with the LPD Office of Professional Standards.

47.     At all times relevant, COL had actual knowledge of Sgt. Roberts' unlawful conduct towards me as it had in its possession records of Dispatch call logs, and multiple complaints by me to Roberts' direct supervisor and the OPS.

48.     Sgt. Roberts' disdain for his only female subordinate (me) was blatantly obvious.

49.     In fact, Sgt. Roberts made gender-motivated statement(s) to the Office of Professional Standards about Plaintiff.

50.      Sgt. Roberts' sworn statement(s) include comments to the effect that I was "always crying" "because she is sensitive."

51.     Sgt. Roberts' comments about my "sensitive" emotional state is unlawful gender stereotyping. *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

52.     Sgt. Roberts' comments about my appearance and hairstyle are unlawful gender stereotyping. *Id.*

53.     Sgt. Roberts' comments about my emotional state and appearance are direct evidence that his unlawful actions towards me were motivated by Plaintiff's gender.

54.     Sgt. Roberts' comments about Plaintiff's appearance and emotional state are direct evidence of gender discrimination.

55.     Sgt. Roberts' did not critique the hairstyles of my male coworkers.

56.     Sgt. Roberts' did not ask my male coworkers if they brushed their hair.

57.     Sgt. Roberts' did not critique the emotions of my male coworkers.

58.     Sgt. Roberts' did not call my male coworkers "sensitive" or "cry babies."

59.     Sgt. Roberts' did not suggest that my male coworkers were unavailable to take extra calls because they were busy doing "male strip searches."

60.     Sgt. Roberts' targeted me because I was a female – the only female – in his squad.

61.     Sgt. Roberts assigned extra work to me (but not to my male counterparts) every week – and almost every shift from the period March 2019 through the summer and fall of 2019.

62.     Sgt. Roberts' harassment of me was severe and pervasive – occurring every week and almost every shift.

63.     The July 2019 shift briefing alone was enough to alter the terms and conditions of my employment because it sent a strong message to me (and the other officers) that complaints about workplace harassment would be met with swift retaliation from COL's supervisory officers.

64.     The threat of retaliation was real.

65.     Sgt. Roberts unequivocally retaliated against me for filing a formal complaint against him in September 2019. He attacked my credibility and good name by filing his own complaint.

66.     COL's Office of Professional Standards closed my complaint against Sgt. Roberts after months of an alleged "investigation."

67.    COL did not discipline Sgt. Roberts following the alleged investigation into my complaints.

68.    COL did not demote Sgt. Roberts following the alleged investigation into my complaints.

69.    COL did not give Sgt. Roberts a negative performance evaluation following the alleged investigation into my complaints.

70.    Immediately after the OPS closed its investigation (in early 2020), Sgt. Roberts filed a formal complaint against me. The complaint filed by Roberts against me includes a statement that Sgt. Roberts was filing the complaint *because* I complained about workplace harassment.

71.    Sgt. Robert's formal complaint against me resulted in a multi-day, unpaid suspension.

72.    Sgt. Robert's complaint against me in early 2020 was retaliatory.

73.    I lost wages because of Sgt. Robert's retaliatory conduct.

74.    I lost accrued sick pay because of Sgt. Robert's retaliatory and discriminatory conduct.

75.     I lost my peace of mind, sense of dignity and personal calm because of Sgt. Robert's retaliatory and discriminatory conduct.

76.     I was prevented from transferring because of Robert's retaliatory conduct.

77.     Sgt. Robert's conduct towards me would have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020) ("mistreatment based on retaliation for protected conduct . . . is actionable whether or not the mistreatment rises to the level of a tangible employment action . . .").

78.     COL, through its supervisors and employees, created a hostile work environment for me.

79.     In fact, COL has a history, pattern and practice of creating a hostile work environment for its female officers. *See Smith v. City of Lakeland, Florida*, Case no. 8:20-cv-41-MSS-JSS, D.E. 20, D.E. 27 (Dec.9, 2020) (Order denying Motion to Dismiss).[1]

---

[1] Evidence of discrimination against other victims is admissible and relevant to show motive, intent or plan to discriminate. Indeed, Supreme Court has held that "wide evidentiary latitude should be granted to those attempting to prove discriminatory intent . . ." *U.S. Postal Serv. v. Aikens*, 460

80.     Lt. Sealey (Sgt. Robert's direct supervisor) has a pattern and practice of humiliating female police officers, including me. *Id.*

81.     Lt. Sealey has a pattern and practice of treating gender discrimination complaints made by female officers, including me, as a "joke." *Id.* Indeed, Sealey suggested that I didn't have the gall to take my complaint over his head.

82.     Lt. Sealey has a history of mishandling internal complaints about police misconduct. In 2011, Sealey (a Sgt. at the time) was suspended for a month without pay for nine (9) violations of department policy, including interfering with an investigation against his friend (a former Lieutenant) accused of stalking his now ex-wife.[2]

83.     COL had knowledge of Sealey's propensity for misconduct yet promoted him anyway.

---

U.S. 711, 714 n. 3 (1983); *see also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008); *Phillips v. Smalley Maint. Servs., Inc.*, 711 F.2d 1524, 1532 (11th Cir. 1983).

[2] *Police Sgt. Sealey Suspended Over Schrader Inquiry*, The Ledger, Geary, J. (June 10, 2011); available online at
https://www.theledger.com/article/LK/20110610/News/608085404/LL.

84.     COL had knowledge of Sealey's propensity to mishandle internal investigations yet it did nothing to remedy the fact that Sealey took no action to protect Plaintiff in the summer of 2019.

85.     Had Lt. Sealey done his job and promptly investigated my 2019 complaints against Sgt. Roberts, Roberts' conduct likely would not have escalated to the point of causing me physical harm and illness.

86.     Had COL promptly reprimanded Sgt. Roberts when I first complained, Robert's conduct would not have escalated to the point of me being suspended pending a retaliatory investigation.

87.     COL has a pattern and practice of promoting officers who are known to be unwilling and/or incapable of investigating and complaints about officer misconduct.

88.     COL has a pattern and practice retaliating against females who complain about gender discrimination/harassment by encouraging and protecting male officers who file false allegations against their female accusers.

89.     COL has a pattern and practice of permitting its male officers to discredit their female accusers, including me, so as to discourage future complaints about gender discrimination and/or harassment. *Id.*

90.     COL has a pattern and practice of preventing the transfer of females, including me, who complain about gender discrimination/harassment in an effort to keep us under the control of their accused so as to discourage future complaints. *Id.*

91.     COL does not treat men and women the same.

92.     COL treats men better than women.

93.     The officers featured on the homepage of COL's website are all men.

94.     COL encourages a "good old boy" mentality among its police force.

95.     My direct supervisors treated me differently than my male counterparts.

96.     My supervisors intentionally embarrassed me publicly because of my gender and in retaliation for my complaints about gender discrimination and harassment at work.

97.     Sgt. Roberts made comments on the public radio referencing my gender and that were designed to embarrass me by suggesting that I couldn't complete excess job assignments because I was busy doing female strip searches.

98.     COL's disparaging treatment of women is dangerous.

99.     COL's culture of protecting male officers accused of discrimination and/or harassment is dangerous.

100.    The public expects police officers to work together as a team to protect the health and safety of all citizens.

101.    The public expects police officers to be adequately trained in compliance with federal civil rights laws.

102.    The public expects police officers to hold each other accountable when they make mistakes.

103.    The public expects prompt remedial action when a police officer engages in misconduct at work.

104.    The citizens and patrons of Lakeland, Florida have an interest in the outcome of this case and the transparency and accountability of their police department.

DocuSign Envelope ID: D5751869-3BCC-470C-B871-336877A3169C

105.    The citizens and patrons of Lakeland, Florida have an interest in ensuring that the LPD follows federal civil rights laws.

106.    COL is an entity covered by Title VII.

107.    COL had actual knowledge of the discrimination and harassment suffered by me at work.

108.    COL had actual knowledge of the discrimination and harassment suffered by women at work – by the same supervisory officers.

109.    COL did not take prompt remedial action to stop my supervisor(s) from harassing me and/or treating me differently because of my gender.

110.    The harassment/discrimination I experienced at work was motivated in whole or in part by my gender.

111.    The harassment I experienced at work was severe.

112.    The harassment I experienced at work was pervasive.

113.    Sgt. Roberts' conduct during the majority of 2019 and 2020 constituted gender-motivated micro-aggressions towards me.

114.    COL permitted Sgt. Roberts to assign more work to me than my male coworkers.

115.  My supervisors discouraged male officers from helping me complete the extra work assignments given to me by my supervisor.

116.  COL took an adverse employment action against me when it suspended me without pay in April 2020.

117.  COL took an adverse employment action against me when it prevented me from transferring squads so I could get away from Sgt. Roberts.

118.  COL took an adverse employment action against me when it placed me on probation.

119.  I suffered harm and continues to suffer harm because of the discrimination, harassment and retaliation I experienced at work.

120.  The taxpayers and citizens of Lakeland suffer harm when COL permits its officers and supervisors to engage in misconduct that violates federal civil rights laws.

121.  I filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC) on or around May 13, 2020 (Charge No. 511-2020-03259).

122.  My Charge of Discrimination was timely filed.

123.    The EEOC issued a Notice of Right to Sue on August 24, 2020.

124.    I received my Notice of Right to Sue on or after August 27, 2020.

125.    I filed my original Complaint on November 25, 2020.

126.    My Complaint was filed within ninety (90) days of my receipt of the Notice of Right to Sue.

I declare under penalty of perjury that the foregoing is true and correct.

3/3/2022
_____
Date

DocuSigned by:
*Jordain Chambers*
BEB6C4187617482...
_____
Jordain Chambers