UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JORDAIN CHAMBERS,

     Plaintiff,

v.                                    Case No. 8:20-cv-2794-JLB-SPF

CITY OF LAKELAND,

     Defendant.

_____/

## ORDER

     Defendant City of Lakeland (the "City") moves for summary judgment on Plaintiff Jordain Chambers's Title VII claims for gender discrimination, gender harassment, and retaliation.  (Doc. 29.)  After careful review of the record, the parties' briefs, and viewing the facts in the light most favorable to Ms. Chambers, the City's motion for summary judgment is granted.

## BACKGROUND

     Ms. Chambers served Lakeland Police Department ("LPD") as a patrol officer and member of the Southeast Division of the Alpha Squad.  (Doc. 29 at 1, ¶ 1.)[1]

---

[1] The City's motion includes a Statement of Material Facts as required by the Instructions Regarding a Statement of Material Facts for a Motion for Summary Judgment, found on the Court's webpage.  See https://www.flmd.uscourts.gov/ sites/flmd/files/judges/forms/flmd-badalamenti-instructions-regarding-a-statement-of-material-facts-for-a-motion-for-summary-judgment.pdf.  In her response, Ms. Chambers "admits" the entirety of all paragraphs in the City's Statement of Material Facts except Paragraph 13, relating to whether Ms. Chambers alleged certain conduct in a prior employee incident report.  (Doc. 36 at 3; Doc. 29 at 7, ¶ 13.)  Contrary to the Court's instructions, however, in her denial of Paragraph 13 Ms. Chambers does not "set forth a pinpoint citation to the record where the fact is

Alpha Squad was commanded by Lt. Mike Lewis and, as of July 23, 2019, Sgt. Jeff Gary was the sergeant in charge of the Southeast District and Sgt. James Roberts was the sergeant in charge of the Southwest District.  (Doc. 29-7 at 466; Doc. 29-10 at 1–2, ¶ 4.)

On September 20, 2019, Ms. Chambers submitted an employee incident report against Sgt. Roberts in which she alleged that she was "treated unfairly due to [her] gender and position within the department" and was "continuously given extra work assignments, verbally humiliated, and singled out in a public manner while conducting [her] work duties."  (Doc. 29-7 at 6.)  She complained of several specific incidents.

First, Ms. Chambers, on June 11, 2019, asked LPD Communications to dispatch her to a narcotics call for which she had provided information.  (Id. at 6–7, 549.)  Sgt. Roberts asked Ms. Chambers over the radio why she had placed herself on the call and whether she was responding to conduct a search of a female suspect.  (Id. at 125–26; Doc. 29-10 at 2, ¶ 5.)  Ms. Chambers responded that "property is intel I gave them."  (Doc. 29-7 at 125–26.)

Second, on June 14, 2019, Ms. Chambers began her shift at 10:00 a.m. and broadcasted that she was working on reports and subject to call.  (Doc. 29-10 at 2–3, ¶ 6.)  At 10:44 a.m., Officer David Kaiser was dispatched to a domestic violence complaint, and Sgt. Roberts reassigned the dispatch to Ms. Chambers.  (Id.; Doc. 29-

---

disputed."  She also sets forth additional facts in support of her claims.  (Doc. 36 at 3, ¶¶ 1–11.)  All facts are viewed in a light most favorable to the nonmoving party, Ms. Chambers.

7 at 155, 161–62, 174.)  Sgt. Roberts reassigned the dispatch because Officer Kaiser had been on shift longer and had already responded to "numerous" calls, while Ms. Chambers's shift had just begun.  (Doc. 29-10 at 2–3, ¶¶ 6–8.)

Ms. Chambers sent Sgt. Roberts a text message stating, "Sir, I'm down reports and [Officer Kaiser is] not."  (Doc. 29-7 at 18; Doc. 29-10 at 3, ¶ 7.)  Sgt. Roberts responded, "He's been answering calls all morning.  You need better time management."  (Doc. 29-7 at 18.)  Ms. Chambers responded, "Excuse me, but . . ." and explained why she was behind on her reports.  (Id.)  Sgt. Roberts instructed Ms. Chambers to meet him at the station, and she met with him and Sgt. Gary.  (Doc. 29-10 at 3–4, ¶ 9; see also Doc. 29-11 ¶¶ 4–11.)  Sgt. Roberts asked Ms. Chambers if the words "excuse me" were intended to be professional or sarcastic, and she replied that it was sarcastic slang and was how things were done up north.  (Doc. 29-10 at 3–4, ¶ 9.)  Sgt. Roberts asked Ms. Chambers about her reports, to which she replied that Sgt. Doug Mills, her officer in command in the evening hours, had instructed her to broadcast that she was out working on reports and subject to call and to work on the reports immediately.  (Id.)  Sgt. Mills lacked authority to do so.  (Id.)

At the meeting, Sgt. Roberts and Sgt. Gary also raised concerns with Ms. Chambers about her ability to work calls without supervision because she called her supervisors on nearly every call with questions.  (Id. at 4, ¶ 10; Doc. 29-11 at ¶¶ 6–7.)  Aware that Ms. Chambers sustained an injury during training, Sgt. Gary offered limited retraining, but Ms. Chambers declined.  (Doc. 29-11 at ¶¶ 8–10; Doc. 29-10 at 4, ¶ 10.)  Sgt. Roberts asked Ms. Chambers whether she thought she had

been adequately trained, and Ms. Chambers responded in the affirmative.  (Doc. 29-10 at 4, ¶ 10.)  He also advised Ms. Chambers to provide possible solutions before calling with questions and that the goal was for her to work through her calls and become a problem-solver.  (Id.)  Ms. Chambers does not dispute that the meeting was professional and within the duties and responsibilities of an LPD sergeant. (Id.; Doc. 29-11 at 2, ¶ 11; Doc. 36 at 3.)

Third, around June 28, 2019, Sgt. Roberts was contacted by Evelyn Berrazueta, a secretary in the LPD's Uniform Patrol Division, regarding Ms. Chambers's failure to respond to five electronic witness subpoenas from February 11 through May 28, 2019.  (Doc. 29-10 at 4, ¶ 11; Doc. 29-7 at 179–80, 215–23, 234.) Sgt. Roberts informed Ms. Chambers of the relevant LPD General Orders, which govern the conduct of all LPD officers and employees, and provided her a copy. (Doc. 29-10 at 4, ¶ 11; Doc. 29-2 at 1, ¶ 4.)  As "small-talk," Sgt. Roberts also asked her why she was working the "10-10 shift," which was considered an undesirable shift.  (Doc. 29-10 at 5, ¶ 12; Doc. 29-7 at 553–54.)

Fourth, on July 13, 2019, Sgt. Roberts reassigned a call for service on a child abuse investigation from Officer Balser to Ms. Chambers.  (Doc. 29-10 at 5, ¶ 13; Doc. 29-7 at 251.)  There were several reasons for this, including that Officer Balser's shift ended within an hour and Sgt. Roberts did not want the LPD to pay overtime when Ms. Chambers and another shift officer, Officer Sanchez, were available.  (Doc. 29-10 at 5, ¶ 13.)  Additionally, the only other relief officers were off due to a military drill, the two officers who normally covered the area were

unavailable, and Officer Sanchez had worked seven calls for service whereas Ms. Chambers had worked only one.  (Id.)

Fifth, on September 3, 2019, Ms. Chambers responded to a shoplifting complaint as back-up for Officer Christopher Bolen because the suspect in custody was female.  (Id. at 6, ¶ 14; Doc. 29-7 at 268, 272.)  After Ms. Chambers had been on scene for an hour, Sgt. Roberts asked Officer Bolen whether Ms. Chambers was still needed there, and Officer Bolen told him that Ms. Chambers would be leaving in about ten minutes.  (Doc. 29-7 at 287; Doc. 29-10 at 6, ¶ 14.)  Sgt. Roberts was unaware at the time that there were two minor children who required attention. (Doc. 29-10 at 6, ¶ 14.)

Sixth, on September 3, 2019, Ms. Chambers advised Communications that she was busy with reports at the station.  (Id. at 6, ¶ 15.)  Sgt. Roberts asked Ms. Chambers for her status, to which she replied that she was working on reports.  (Id.; Doc. 29-7 at 301.)  Ms. Chambers asked Communications to change her status to "out of service, subject to call – on reports."  (Doc. 29-7 at 302; Doc. 29-10 at 6, ¶ 15.) Because the LPD's Computer Aided Dispatch system (CAD) indicated that Ms. Chambers was at the station, Sgt. Roberts asked Ms. Chambers whether she was still at the station, and she responded in the negative.  (Doc. 29-10 at 6, ¶ 15; Doc. 29-7 at 312; Doc. 29-7 at 24.)  Sgt. Roberts asked whether Ms. Chambers had advised Communications that she was in service, to which she replied that she advised Communications she was out of service.  (Doc. 29-7 at 312.)  Sgt. Roberts checked Ms. Chambers's GPS and saw that she was not at the station.  (Doc. 29-10

at 6, ¶ 15.)  Sgt. Roberts then asked her why her GPS showed she was not at the station while her CAD showed that she was at the station.  (Id.)  She replied that when she was at the station dropping off paperwork, she advised Communications to show her as out of service, not in the station.  (Doc. 29-7 at 318.)

Finally, on September 8, 2019, Sgt. Roberts reassigned a vehicle accident investigation in the Southeast District from Officer Kaiser to Ms. Chambers.  (Doc. 29-10 at 6–7, ¶ 16; Doc. 29-7 at 340.)  Months prior, Sgt. Roberts and Sgt. Gary agreed that officers were responsible for their zones and district.  (Doc. 29-10 at 6–7, ¶ 16.)  At the time of the September 8, 2019 reassignment, Officer Kaiser was assigned to the Southwest District, and Ms. Chambers was the only available unit in the Southeast District.  (Id.)

After Ms. Chambers filed her September 2019 employee incident report against Sgt. Roberts, consistent with internal protocols for gender discrimination complaints, Sgt. Roberts was reassigned to the Northeast District and removed from Ms. Chambers's chain of command.  (Doc. 29-10 at 1–2, ¶ 4; Doc. 29-12 at 2, ¶ 8; Doc. 29-2 at 4, ¶ 14.)  Sgt. Deas was thereafter reassigned to the Southwest District.  (Doc. 29-12 at 2, ¶ 8.)  Chief of Police Ruben Garcia also ordered that the Office of Professional Standards ("OPS") investigate Ms. Chambers's allegations. (Doc. 29-2 at 3, ¶ 13.)  The investigation was assigned to Detective Stephanie Burcham who was assisted by Detective Paula Parker.  (Doc. 29-7 at 2, 5, 43–87; Doc. 29-13 at 1, ¶ 4.)  The investigation included witness interviews.  (Doc. 29-7 at 76–79.)  Following the investigation, Sgt. Sealey determined that "Sergeant James

Roberts acted properly and well within department policy and his duty as a sergeant with the Lakeland Police Department" and that Ms. Chambers's allegations against Sgt. Roberts were "unfound[ed]." (Id. at 110; Doc. 29-14 at 2, ¶¶ 7–8.) Lt. Douglas Brown, Capt. Bowling, Asst. Chief Taylor, and Chief Garcia each reviewed the file and concurred with the results of the investigation. (Doc. 29-7 at 112–14.)

On September 25, 2019, Sgt. Roberts conducted a briefing to Alpha Squad members and ordered them to avoid entering the station unless for work or to use the restroom, to stay out of Communications, and not to bring food or drinks to dispatchers. (Doc. 29-8 at 198; Doc. 29-10 at 7, ¶ 18; Doc. 29-11 at 3, ¶¶ 13–14; Doc. 29-15 at 1, ¶ 4; Doc. 29-16 at 3, ¶¶ 12–13.) Ms. Chambers was present and heard the orders. (Doc. 29-8 at 183, 185, 198.) Notwithstanding, on October 6, 2019, Sgt. Thompson told Sgt. Gary that he had seen Ms. Chambers walking away from Communications. (Id. at 5; Doc. 29-11 at 3, ¶ 15; Doc. 29-16 at 3, ¶ 15.) Sgt. Gary learned from a member of Communications that Ms. Chambers delivered donuts to the Communications Center. (Doc. 29-16 at 3, ¶ 15.) On October 7, 2019, without any involvement from Sgts. Roberts, Deas, or Sealey, Sgt. Gary submitted a sworn employee incident report against Ms. Chambers for neglect of duty and insubordination. (Id. at 3, ¶ 16; Doc. 29-10 at 7, ¶ 19; Doc. 29-11 at 3, ¶¶ 15–16; Doc. 29-12 at 3, ¶ 14; Doc. 29-8 at 4–6, 27.)

Chief Garcia ordered an investigation, which was conducted by Detective Parker with assistance from Detective Burcham and included witness interviews.

(Doc. 29-8 at 6, 27–41; Doc. 29-2 at 4, ¶ 18; Doc. 29-13 at 2, ¶ 5.)  Ms. Chambers admitted that she brought donuts into the Communications Center after Sgt. Roberts told her and others that food and drink should not be brought to Communications.  (Doc. 29-8 at 183, 185, 198.)  Following the investigation, Sgt. Fetz, who was part of a different chain of command from Sgts. Roberts, Gary, and Deas, found that Ms. Chambers had committed the infraction.  (Doc. 29-8 at 42; Doc. 29-2 at 5, ¶ 19.)  Lt. Brown, Capt. Bowling, Asst. Chief Taylor, and Chief Garcia concurred with the results of the investigation; and, in April 2020, Ms. Chambers was suspended for six days.  (Doc. 29-8 at 42–47; Doc. 29-2 at 5–6, ¶ 20.)  Although the violation could have resulted in dismissal, Chief Garcia decided a six-day suspension was the lowest reasonable level of discipline to obtain correction and was consistent with sanctions of other officers who had committed similar violations.  (Doc. 29-2 at 5–6, ¶ 20.)

On March 13, 2020, Sgt. Roberts brought a formal complaint against Ms. Chambers, alleging that her 2019 employee incident report against him was reckless, frivolous, and based on invalid facts, and that she had violated various General Orders by filing it.  (Doc. 29-9 at 5–16; Doc. 29-2 at 6, ¶ 23; Doc. 29-10 at 7, ¶ 20.)  Sgt. Roberts's charges against Ms. Chambers were ultimately "not sustained" for "insufficient evidence to prove or disprove the allegation[s]."  (Doc. 29-9 at 60–62, 64.)

In addition to the above, Ms. Chambers also avers that Sgt. Roberts

criticized her for "not working fast enough" but "did not tell [her] male coworkers they were not working fast enough." (Doc. 36-1 ¶¶ 17–18, 37.) Sgt. Roberts also made comments to Ms. Chambers about her hair. (Id. ¶¶ 19, 44.)[2] Sgt. Roberts further told LPD Dispatch employees to "hold a log of 'extra calls' for [Ms. Chambers] to work" and "did not ask dispatch to hold extra calls for [her] male coworkers." (Id. at 3, ¶¶ 20–21.) Finally, Ms. Chambers maintains that she complained to her lieutenant about Sgt. Roberts in July 2019, that the lieutenant "treated the complaint like a joke" and "declined to act," and that during the next shift Sgt. Roberts held a briefing in which he told the "entire squad that he was filing a complaint against [Ms. Chambers] for failure to follow a direct order." (Id. ¶¶ 26–31.) Specifically, Sgt. Roberts accused her of "being in the police station when [she] was not supposed to be," and Ms. Chambers avers that "[e]ven if [she] had done something wrong the manner in which Sgt. Roberts berated me in front of

---

[2] As noted, Ms. Chambers disputes that she did not allege in her employee incident report that Sgt. Roberts or Sgt. Gary asked her, "why do you wear your hair in a bun" and "do you even brush your hair," that Sgt. Roberts commented that Ms. Chambers was "always crying" "because she is sensitive," or that she suffered any "micro-aggressions." (Doc. 36 at 3; Doc. 36-1 ¶¶ 19, 50, 113.) However, Ms. Chambers fails to provide pinpoint citations to record evidence that such allegations were included in the employee incident report. See United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); Carolina Acquisition, LLC v. Double Billed, LLC, 627 F. Supp. 2d 1337, 1340 (S.D. Fla. 2009) ("Federal judges are not archaeologists. We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment." (citation omitted)). Sgt. Roberts disputes that he made any such statements. (Doc. 29-10 at 7, ¶ 21; see also Doc. 29-11 at 4, ¶¶ 18–19; Doc. 29-12 at 2, ¶ 12; Doc. 29-15 at 2, ¶ 6.) In all events, summary judgment in the City's favor is warranted, even if all statements in Ms. Chambers' declaration are considered and credited. (See, e.g., Doc. 36-1 ¶¶ 19, 50.)

so many [sic]."  (<u>Id.</u> ¶ 34.)  Around the same time, Lt. Tye Thomas told her to "keep [her] head down" to avoid retribution by Sgt. Roberts.  (<u>Id.</u> ¶ 38.)[3]

Ms. Chambers filed suit against the City, raising three Title VII claims: gender discrimination (Count I); gender-based harassment (Count II); and retaliation (Count III).  (Docs. 1, 11.)  The City now moves for summary judgment on all counts.  (Doc. 29.)  Ms. Chambers has responded in opposition and filed a declaration in support.  (Docs. 36, 36-1.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If this showing is made, "the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial."  <u>Shaw v. City of Selma</u>, 884 F.3d 1093, 1098 (11th Cir. 2018) (quotation omitted).

"A fact is 'material' if it has the potential of 'affect[ing] the outcome' of the case."  <u>Id.</u> (citation omitted).  "And to raise a 'genuine' dispute, the nonmoving party must point to enough evidence that 'a reasonable jury could return a verdict for [her].'"  <u>Id.</u> (citation omitted).  "When considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor.'"  <u>Id.</u> (citation omitted).  "[A]n inference is not reasonable if

---

[3] Lt. Thompson disputes that he told Ms. Chambers to "keep her head down" to avoid retribution.  (Doc. 29-16 at 2, ¶ 7.)  Summary judgment in the City's favor is warranted even if Ms. Chambers's declaration is credited.

it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." <u>Daniels v. Twin Oaks Nursing Home</u>, 692 F.2d 1321, 1324 (11th Cir. 1982) (internal quotation marks and citation omitted).

## DISCUSSION

### I.    Count I: Gender Discrimination Under Title VII

In Count I, Ms. Chambers alleges that the City "discriminated against [her] in whole or in part because of her gender." (Doc. 11 at 19, ¶ 132.)  Specifically, she complains of the following: being "assigned . . . additional work duties"; the City "refus[ing] to investigate [her] complaints of harassment"; and the City "suspending . . . and preventing [her] from transferring to another squad." (<u>Id.</u> ¶¶ 133–38.)

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on race, color, religion, sex, or national origin. <u>See</u> <u>Ricci v. DeStefano</u>, 557 U.S. 557, 577 (2009).  "A plaintiff alleging a claim of disparate treatment must establish that the employer intended to discriminate against the protected group." <u>Armstrong v. Flowers Hosp., Inc.</u>, 33 F.3d 1308, 1313 (11th Cir. 1994).[4]  "Disparate treatment claims require proof of discriminatory intent either through direct or circumstantial evidence." <u>Denney v. City of Albany</u>, 247 F.3d 1172, 1182 (11th Cir. 2001) (quotation omitted).

---

[4] Title VII prohibits "both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on [a protected group] (known as 'disparate impact')." <u>Ricci</u>, 557 U.S. at 577.  The parties agree that Ms. Chambers is bringing a "disparate treatment" claim. (Doc. 29 at 14; Doc. 36 at 8.)

Direct evidence of discrimination is "evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999) (quotation omitted). "To qualify as direct evidence of discrimination . . . a biased statement by a decision-maker [must] be made concurrently with the adverse employment event, such that no inference is necessary to conclude that the bias necessarily motivated the decision." Williamson v. Adventist Health Sys./Sunbelt, Inc., 372 F. App'x 936, 940 (11th Cir. 2010). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor" qualify. Rojas v. Florida, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (quotation omitted). Suffice it to say, this is a "rigorous standard." Damon, 196 F.3d at 1359.

Apart from Ms. Chambers's unsupported assertions to the contrary, she does not offer any direct evidence of discrimination. (Doc. 36 at 8.) In other words, she points to no biased statement by a decision-maker made concurrently with the adverse employment action, such that no inference is necessary to conclude that the bias necessarily motivated the decision. See Williamson, 372 F. App'x at 940; see, e.g., Walker v. St. Joseph's/Candler Health Sys., Inc., 506 F. App'x 886, 888 n.1 (11th Cir. 2013) (no direct evidence of discrimination, even where decisionmaker told plaintiff she "should go back to the night shift" to "be with her own kind," because statement did not prove discrimination without inference).

Because Ms. Chambers relies instead on circumstantial evidence, her Title VII intentional discrimination claim "is evaluated under the [McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)], burden-shifting framework." Tebo v. City of DeBary, 784 F. App'x 727, 729–30 (11th Cir. 2019) (citation omitted). Under this framework, Ms. Chambers must first establish a prima facie case of discrimination. Id. at 730. To do so, she must demonstrate that: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was treated less favorably than a similarly situated individual outside her protected class. See Maynard v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003). Ms. Chambers and her proffered comparator must be "similarly situated in all material respects," which generally requires that the comparator "engaged in the same basic conduct (or misconduct) as the plaintiff" and that the two "cannot reasonably be distinguished." Lewis v. City of Union City, 918 F.3d 1213, 1218, 1227–28 (11th Cir. 2019) (quotation omitted); see also Feise v. N. Broward Hosp. Dist., 683 F. App'x 746, 751 (11th Cir. 2017) ("[T]he appropriate question is not whether the [comparator's] alleged violations were worse than [the plaintiff's], but instead whether the [comparator's] violations were sufficiently similar to [the plaintiff's]." (quotations and emphasis omitted)).

"[O]nce a plaintiff successfully establishes a prima facie case of [discrimination], the burden then shifts to the employer to proffer a legitimate, non-discriminatory reason for its employment decision against the plaintiff." Tebo, 784

F. App'x at 730 (citation omitted).  "If an employer offers such a legitimate reason, the burden shifts back to the plaintiff to show that the proffered reason is a pretext for discrimination."  Id. (citation omitted).

In addition to the McDonnell Douglas framework, a Title VII intentional discrimination claim can also be established by "a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." Lewis, 918 F.3d at 1220 n.6 (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)).  A plaintiff meets this standard by showing, "among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual."  Lewis v. City of Union City, 934 F.3d 1169, 1185 (11th Cir. 2019) (internal quotation marks, citations, and ellipses omitted).

Ms. Chambers has not clearly identified a similarly situated comparator, and the "convincing mosaic" method of proof is the only standard she mentions in her response.  (Doc. 36 at 8, 10–11.)  Ultimately, however, Ms. Chambers's intentional discrimination claim fails under either framework.[5]

---

[5] As noted, Ms. Chambers relies on a "mosaic" theory to prove discrimination. Lewis, 918 F.3d at 1220 n.6.  Even if her claims were evaluated under a "mixed-motive" framework, however, summary judgment in the City's favor is warranted. (See, e.g., Doc. 11 at 19, ¶ 132); see Quigg v. Thomas Cnty. Sch. Dist., 814 F.3d 1227, 1235 (11th Cir. 2016) (distinguishing "mixed-motive" and "single-motive" claims).  Indeed, for reasons explained in this Order, Ms. Chambers has not shown that any "discriminatory input, such as sex or gender-based bias, factored into [a] board's decisional process" or was a motivating factor in any adverse employment action.  Quigg, 814 F.3d at 1232–33, 1241 (quotations omitted).

First, assuming additional work in these circumstances constitutes an adverse employment action, there is no record evidence demonstrating that Ms. Chambers was assigned additional work because of her gender.  For example, Sgt. Roberts assigned the June 14, 2019 domestic violence call to Ms. Chambers because the other officer had already worked numerous calls that morning and Ms. Chambers's shift had just begun.  (Doc. 29-10 at 2–3, ¶¶ 6–8.)  Further, Sgt. Roberts was unaware that Ms. Chambers was behind on reports.  (Id. at 3–4, ¶ 9.)

Similarly, Sgt. Roberts reassigned the July 13, 2019 child abuse call to Ms. Chambers because the original officer's shift ended within an hour and Sgt. Roberts did not want the LPD to pay overtime when Ms. Chambers and another shift officer were available.  (Id. at 5, ¶ 13.)  Additionally, the only other relief officers were: off from work due to a military drill, the two officers who normally covered the area were unavailable, and the other shift officer had worked seven calls for service whereas Ms. Chambers had worked only one.  (Id.)

Finally, Sgt. Roberts reassigned the September 8, 2019 vehicle accident investigation in the Southeast District to Ms. Chambers because he and Sgt. Gary had agreed that officers were responsible for their zones and district.  (Id. at 6, ¶ 15.)  The original officer was assigned to the Southwest District, and Ms. Chambers was the only available unit in the Southeast District.  (Id.)  In sum, each reassignment identified in Ms. Chambers's employee incident report was based on reasons other than her gender—a fact she does not appear to dispute.  (Doc. 36 at 3; Doc. 29 ¶¶ 1–12, 14–22.)

15

These are the only incidents for which there is any detailed record evidence. As noted, Ms. Chambers also avers that Sgt. Roberts told her that she was "not working fast enough" but "did not tell [her] male coworkers they were not working fast enough," and instructed LPD Dispatch employees to "hold a log of 'extra calls' for [Ms. Chambers] to work" and "did not ask dispatch to hold extra calls for [her] male coworkers." (Doc. 36-1 at 3, ¶¶ 20–21.)  These averments are likewise insufficient to support her discrimination claim in Count I.

Indeed, there is no evidence that any comments Sgt. Roberts made to her about work efficiency or time management were based on gender.  Even if it is true that Sgt. Roberts did not tell Ms. Chambers's male coworkers that they were not working fast enough, there is no record evidence establishing that these unidentified male coworkers were similarly situated to her, despite counsel's statements to this effect in Ms. Chambers's response.  (Doc. 36 at 3–4); Travaglio v. Am. Exp. Co., 735 F.3d 1266, 1270 (11th Cir. 2013) ("Statements by counsel in briefs are not evidence." (quotation omitted)).

The same is true of the purported log of "extra calls" for Ms. Chambers to work, ordered by Sgt. Roberts "[i]n early 2019."  (Doc. 36-1 at 3, ¶ 20.)  For starters, to the extent these "extra calls" overlap with the allegations in Ms. Chambers's September 2019 employee incident report, as noted, there is no evidence indicating that the reassignments were motivated by gender.  To the extent the "extra calls" pertain to separate conduct, there is no record evidence that her male coworkers who were not assigned "extra calls" were similarly situated to Ms. Chambers or, in

16

all events, that any such decision was motivated by gender.  Indeed, there is hardly any evidence about the "extra calls" or Ms. Chambers's male coworkers at all.

In short, as to her additional work claim, Ms. Chambers has not shown that she was treated less favorably than a similarly situated individual outside her protected class.  And even if she has made a prima facie case, the City has proffered a legitimate, nondiscriminatory reason for its decisions, and Ms. Chambers has not shown that the proffered reason is a pretext for discrimination.

Next, the record evidence conclusively refutes Ms. Chambers's unsupported allegation that the City "refused to investigate [her] complaints of harassment because of her gender." (Doc. 11 at 19, ¶¶ 135.)  Indeed, the investigation included numerous interviews and culminated in a lengthy and thorough report, which was then reviewed by several individuals, including the Chief of Police.  (Doc. 29-2 at 3, ¶ 13; Doc. 29-7 at 76–79, 112–14.)  Additionally, during the pendency of the investigation, consistent with protocol for complaints of gender discrimination, Sgt. Roberts was reassigned to the Northeast District and removed from Ms. Chambers's chain of command.  (Doc. 29-10 at 1–2, ¶ 4; Doc. 29-12 at 2, ¶ 8; Doc. 29-2 at 4, ¶ 14.)  And even if the City did refuse to investigate Ms. Chambers's complaints, there is no evidence that any such refusal was motivated by gender.

In summary, Ms. Chambers has not shown that she was treated less favorably than a similarly situated individual outside her protected class.  And even if she has made a prima facie case, the City, as noted in detail above, has proffered

a legitimate, nondiscriminatory reason for its decisions, and Ms. Chambers has not shown that the proffered reason is a pretext for discrimination.

Finally, there is no evidence to support a finding that Ms. Chambers's gender motivated her April 2020 suspension. (Doc. 36-1 at 17, ¶ 116.)[6] As noted, Sgt. Roberts ordered Alpha Squad members to stay out of Communications and not to bring food or drinks to dispatchers. (Doc. 29-10 at 7, ¶ 18.) Notwithstanding, Ms. Chambers delivered donuts to the Communications Center. (Doc. 29-16 at 3, ¶ 15; Doc. 29-8 at 183, 185, 198.) Without any involvement from Sgts. Roberts, Deas, or Sealey, Sgt. Gary submitted a sworn employee incident report for neglect of duty and insubordination. (Doc. 29-16 at 3, ¶ 16; Doc. 29-10 at 7, ¶ 19; Doc. 29-11 at 3, ¶¶ 15–16; Doc. 29-12 at 3, ¶ 14; Doc. 29-8 at 4–6, 27.)

Following an investigation, Sgt. Fetz, who was part of a different chain of command from Sgts. Roberts, Gary, and Deas, found that Ms. Chambers had committed the infraction. (Doc. 29-8 at 42; Doc. 29-2 at 5, ¶ 19.) Lt. Brown, Capt. Bowling, Asst. Chief Taylor, and Chief Garcia concurred with the results of the investigation, and Ms. Chambers was suspended for six days. (Doc. 29-8 at 42–47; Doc. 29-2 at 5–6, ¶ 20.) Ms. Chambers offers no evidence to refute the City's record

_____

[6] In her declaration, Ms. Chambers avers that "[h]ad [the City] promptly reprimanded Sgt. Roberts when [she] first complained, Robert's [sic] conduct would not have escalated to the point of [her] being suspended pending a retaliatory investigation." (Doc. 36-1 at 13, ¶ 86.) No timeframe or detail is provided as to this suspension "pending a retaliatory investigation." In all events, to the extent she relies on a suspension separate from the April 2020 suspension, Ms. Chambers has failed to present a sufficient factual basis to determine that any such suspension constituted discrimination or was motivated by gender.

evidence that a six-day suspension was consistent with sanctions imposed against other officers who had committed similar violations and was not motivated by gender. (Doc. 29-2 at 5–6, ¶ 20.)

In short, as to her suspension, Ms. Chambers has not shown that she was treated less favorably than a similarly situated individual outside her protected class. And even if she has made a prima facie case, the City has proffered a legitimate, nondiscriminatory reason for its decisions, and Ms. Chambers has not shown that the proffered reason is a pretext for discrimination.

To the extent Ms. Chambers may rely on various comments that Sgt. Roberts or any other individual made to her, independent of an employment decision affecting her pay, tenure, or work responsibilities, those comments do not amount to an adverse employment action. See Gooden v. Internal Revenue Serv., 679 F. App'x 958, 964–65 (11th Cir. 2017). Further, for the above reasons, Ms. Chambers has not established a "convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." Lewis, 918 F.3d at 1220 n.6 (quotation omitted). Indeed, Ms. Chambers does not address—much less satisfy—the factors identified in Lewis, 934 F.3d at 1185. Even viewing the evidence in the light most favorable to Ms. Chambers, as the Court must, there is no evidentiary showing, for example, of suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, a systematically better treatment of similarly situated employees, or a pretextual justification by the City. Accordingly, summary judgment in the City's favor on Count I is warranted.

## II.     Count II: Gender-Based Harassment Under Title VII

In Count II, Ms. Chambers alleges that her "supervisor harassed [her] in whole or in part because of her gender," that the harassment "created a hostile work environment," and that offensive acts and statements made to her "materially altered the terms and conditions of [her] employment."  (Doc. 11 at 22, ¶¶ 147–52.)

To prevail on her hostile work environment claim, Ms. Chambers must prove that: (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such environment under a theory of vicarious or direct liability.  Cornell v. Brennan, 775 F. App'x 630, 633 (11th Cir. 2019) (citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)).  As the Eleventh Circuit explains:

> The requirement that the harassment be severe or pervasive contains an objective and a subjective component.  Thus, to be actionable, this behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives . . . to be abusive.  Ultimately, Title VII is not a general civility code; ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing cannot form the basis of a claim for actionable harassment or hostile work environment.  Instead, conduct must be extreme to amount to a change in the terms and conditions of employment.

Id. (internal quotation marks and citations omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quotation omitted).

In support of her hostile work environment claim, Ms. Chambers relies on various conduct: (1) Sgt. Roberts telling her, but not her male coworkers, that she was not working fast enough; (2) Sgt. Roberts asking dispatch to hold extra calls for Ms. Chambers but not her male coworkers; (3) comments by Sgt. Roberts and Sgt. Gary about her hair but not the hair of her male coworkers; (4) Sgt. Roberts making comments about her over the radio, including that she was "busy doing 'female searches'"; (5) Sgt. Roberts humiliating her during a 2019 shift briefing; (6) Sgt. Roberts filing an employee incident report against her for failure to follow a direct order; (7) Sgt. Roberts commenting that Ms. Chambers was "always crying" "because she is sensitive"; and (8) Lt. Thompson telling her to "keep her head down."  As the City correctly contends, however, Ms. Chambers has failed to establish that this conduct constituted harassment, was based on her gender, or was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment.

First, it would have been proper for Sgt. Roberts, as Ms. Chambers's supervisor, to comment and provide feedback on Ms. Chambers's work efficiency and time management.  For example, when Sgt. Roberts and Sgt. Gary raised concerns with her about her ability to work calls without supervision, they offered her limited retraining and, consistent with the LPD General Orders, advised her to

work through her calls and become a problem-solver.  (Doc. 29-11 at ¶¶ 8–10; Doc. 29-10 at 4, ¶ 10.)  Ms. Chambers does not dispute that the meeting was professional and within the duties and responsibilities of an LPD sergeant.  (Doc. 29-10 at 4, ¶ 10; Doc. 29-11 at 2, ¶ 11; Doc. 36 at 3.)  And when Sgt. Roberts was informed that Ms. Chambers had failed to respond to five electronic witness subpoenas, Sgt. Roberts advised her of the relevant LPD General Orders.  (Doc. 29-10 at 4, ¶ 11; Doc. 29-2 at 1, ¶ 4.)

Further, there is no evidence that comments about Ms. Chambers's work efficiency were based on her gender.  As noted, even if it is true that Sgt. Roberts did not tell her male coworkers that they were not working fast enough, there is no record evidence establishing that these unidentified male coworkers were similarly situated to her.  Moreover, the evidence does not support a finding that any such harassment was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment.

Second, to the extent the "extra calls" assigned to Ms. Chambers overlap with the reassignments described in her employee incident report, Sgt. Roberts made the reassignments for reasons other than gender.  And to the extent the "extra calls" pertain to separate conduct, there is no record evidence that her male coworkers who were not assigned "extra calls" were similarly situated to Ms. Chambers or, in all events, that any such decision was motivated by gender or altered the terms and conditions of her employment.

Third, the few and isolated comments about Ms. Chambers's hair or appearance are insufficient.  (See Doc. 11 ¶ 20; Doc. 36-1 at 2, ¶19 ("Why do you wear your hair in a bun?" and "Do you even brush your hair?").)  Further, while she contends in her response that "it would be impossible to discriminate against the only officer with long hair worn in a bun about her hair in a bun without discriminating against that officer because of her sex," to reach this conclusion she relies on several statements not supported in the record before the Court, including that "[n]one of the male officers wore long hair in a bun."  (See Doc. 36 at 6.)  In all events, these few and isolated statements are not so severe and pervasive as to alter the terms and conditions of employment.  See, e.g., Guthrie v. Waffle House, Inc., 460 F. App'x 803, 804–05 (11th Cir. 2012) (rejecting hostile work environment claim, despite claims that a supervisor and coworker harassed plaintiff by "grabb[ing] [plaintiff's] 'butt' two to five times," kissing her on the cheek, and "talk[ing] dirty" to her).

Fourth, Ms. Chambers does not identify with any specificity the various comments Sgt. Roberts made over the radio.  She avers that he asked her if she "was unable to complete his extra call log because [she] was busy doing 'female searches.'"  (Doc. 36-1 at 3, ¶ 22.)  If she is alluding to Sgt. Roberts's comments on June 11, 2019, as explained, Sgt. Roberts asked Ms. Chambers over the radio why she had placed herself on a narcotics call and whether she was responding to conduct a search of a female suspect.  (Doc. 29-7 at 125–26; Doc. 29-10 at 2, ¶ 5.)  In fact, Florida law provides that a strip search may only be conducted by a person of

the same gender as the arrestee.  See Fla. Stat. § 901.211(1), (3).  If Ms. Chambers is referring to other comments, there is no evidence demonstrating that the comments or any other comments relating to female searches created conditions so severe and pervasive to the point of materially altering the terms and conditions of her employment.

Fifth, according to Ms. Chambers, during a July 2019 shift briefing Sgt. Roberts told Alpha Squad that he would file a complaint against her for failing to follow a direct order by being in the police station when she was not supposed to be. (Doc. 11 ¶¶ 32–33; Doc. 36-1 ¶¶ 29–34.)  She argues that, even if she "had done something wrong," the manner in which Sgt. Roberts made the statements "humiliated" her.  (Doc. 36-1 ¶¶ 33–34.)  However, there is no record evidence supporting that Sgt. Roberts "berated" her because of her gender instead of simply her on-the-job conduct.  In all events, these comments were not so severe or pervasive to alter the terms and conditions of employment and create a hostile or abusive working environment.

Sixth, Sgt. Roberts's employee incident report against Ms. Chambers is also insufficient.  As noted, the allegations in Ms. Chambers's employee incident report against Sgt. Roberts were determined to be "unfound[ed]."  (Doc. 29-14 at 2, ¶¶ 7–8; Doc. 29-7 at 112–14.)  In contrast, in his employee incident report Sgt. Roberts alleged that Ms. Chambers's allegations were reckless, frivolous, and based on invalid facts, and that she had violated various General Orders by filing the report. (Doc. 29-9 at 5–16; Doc. 29-2 at 6, ¶ 23; Doc. 29-10 at 7, ¶ 20.)  Rather than be

deemed "unfounded," Sgt. Roberts's charges against Ms. Chambers were "not sustained" for "insufficient evidence to prove or disprove the allegation[s]."  (Doc. 29-9 at 60–62, 64.)[7]  In all events, there is no record evidence that the filing of this report, evidently in compliance with department policy, constituted harassment so severe or pervasive as to alter the terms and conditions of employment and create a hostile or abusive working environment.

Seven, assuming Sgt. Roberts commented that Ms. Chambers was "always crying" "because she is sensitive," (Doc. 36-1 at 7, ¶ 50), the comment was not sufficiently severe or pervasive to alter the terms and conditions of employment and create a hostile or abusive working environment.  The same is true of Lt. Thompson's comment that she should "keep her head down."  (Doc. 36-1 ¶ 38.)

Finally, to the extent Ms. Chambers relies on separate and unspecified "micro-aggressions," (Doc. 11 at 17, ¶ 115; Doc. 36-1 at 16, ¶ 113), the claim fails. Indeed, there is no record evidence demonstrating the circumstances of any such microaggressions.  And as courts have explained, microaggressions are more similar to "mere offensive utterances" than "physically threatening or humiliating statements," and are insufficient to support a hostile work environment claim.

---

[7] Ms. Chambers claims that "Sgt. Robert's [sic] formal complaint against [her] resulted in a multi-day, unpaid suspension."  (Doc. 36-1 at 10, ¶ 71.)  It is unclear whether she is referring to the complaint for neglect of duty and insubordination filed by Sgt. Gary, or the employee incident report filed by Sgt. Roberts.  Indeed, there is no other record evidence suggesting that Ms. Chambers was suspended as a result of Sgt. Roberts's report, which was not sustained, and this averment is not expounded upon in Ms. Chambers's response.  In all events, any such suspension is insufficient to support Ms. Chambers's claims.

See, e.g., Weinberg v. William Blair & Co., LLC, No. 12-cv-9846, 2015 WL 5731637, at *6 (N.D. Ill. Sept. 30, 2015).[8]

In short, summary judgment in the City's favor on Count II is warranted.

## III.    Count III: Retaliation Under Title VII

In Count III, Ms. Chambers alleges that she engaged in protected activity, that the City took adverse employment actions "when it suspended [her] in April 2020," and that Sgt. Roberts's conduct toward her was retaliatory.  (Doc. 11 ¶¶ 169–77.)

To prevail on her retaliation claim, Ms. Chambers must first establish a prima facie case by showing that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) there is a causal connection between the protected activity and the materially adverse action.  Godwin v. Corizon Health, 732 F. App'x 805, 808 (11th Cir. 2018) (citing Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1181 (11th Cir. 2010)).  The burden then shifts to the City to proffer a "legitimate, non-discriminatory reason for its actions."  Id.  If the City does so, the burden shifts back to Ms. Chambers to show that the reason is

---

[8] To the extent Ms. Chambers also relies on purported retaliatory conduct against an officer who offered to help her "complete the extra calls," the reliance is misplaced.  (Doc. 36-1 at 6, ¶ 40.)  Although in Ms. Chambers's response she—without citation to the record—characterizes that conduct as "bullying," she merely avers in her declaration that the officer was "targeted" and "receiv[ed] negative comments from . . . Officers Gary and Dees."  (Id.; Doc. 36 at 9.)  There are no details as to the nature or frequency of any "negative comments," which were, in all events, not directed at her.  Cf. Gooden, 679 F. App'x at 966 ("As for the other isolated episode of unexplained physical harassment, it was against [plaintiff's] coworker and thus cannot serve as [plaintiff's] adverse employment action on a disparate treatment theory.").

pretextual.  Id.; see also Ring v. Boca Ciega Yacht Club Inc., 4 F.4th 1149, 1163–64

(11th Cir. 2021) (noting that McDonnell Douglas burden-shifting framework applies

to retaliation claims where the plaintiff "relies only on circumstantial evidence").

Title VII does not protect against "those petty slights or minor annoyances that

often take place at work and that all employees experience."  Harrison v. Belk, Inc.,

748 F. App'x 936, 943 (11th Cir. 2018) (quoting Burlington N. & Santa Fe Ry. Co. v.

White, 548 U.S. 53, 68 (2006)).

  Ms. Chambers sets forth several protected activities, including complaining

to Lt. Lewis about Sgt. Roberts, filing the employee incident report against Sgt.

Roberts, and testifying against him during that investigation.  (See Doc. 11 ¶¶ 169–

71.)  It is undisputed that these activities are protected.

  As for the "materially adverse action" requirement, Ms. Chambers relies on

her April 2020 suspension, Sgt. Roberts's "complaint(s) against [her]," Sgt. Roberts's

conduct at the September 2019 squad briefing, and his "continued public

harassment and humiliation of [her] (following [her] complaints about his

behavior)."  (Doc. 11 ¶¶ 172–76.)  Ms. Chambers also avers that she was "prevented

. . . from transferring squads" and was "placed on probation."  (Doc. 36-1 at 17, ¶¶

117–18.)  To satisfy the causation requirement, Ms. Chambers relies on "temporal

proximity between her complaint and the adverse employment action."  (Doc. 36 at

10.)  Apart from this assertion—made without explanation or citation to the

record—there is no evidence establishing a causal connection between any protected

conduct and the claimed materially adverse actions.

Starting with Ms. Chambers's April 2020 suspension, the record evidence reflects that the suspension was precipitated by Ms. Chambers's admitted noncompliance with an order.  (Doc. 29-10 at 7, ¶ 18; Doc. 29-16 at 3, ¶ 15; Doc. 29-8 at 183, 185, 198; Doc. 29-2 at 5–6, ¶ 20.)  And even if Ms. Chambers was able to make out a prima facie case of retaliation, for the same reasons, the City has proffered a "legitimate, non-discriminatory reason for its actions"—namely, neglect of duty and insubordination—and Ms. Chambers is unable to show that the reason is pretextual.  Godwin, 732 F. App'x at 808; see e.g., Johnson v. City of Tampa, No. 8:11-cv-2372-T-33EAJ, 2013 U.S. Dist. LEXIS 66265, at *37 (M.D. Fla. May 9, 2013) ("[F]ailure to promptly obey the lawful order of a supervisor as required by the City's insubordination policy constitutes a legitimate, non-retaliatory reason for [plaintiff's] resulting suspension."); Godoy v. Habersham Cnty., 211 F. App'x 850, 855 (11th Cir. 2006) ("Even assuming [the plaintiff] provided sufficient evidence of a prima facie case of retaliation, the [d]efendants proffered a legitimate nondiscriminatory reason for [the plaintiff's] termination—insubordination.").

As for the remaining purported retaliatory conduct, Ms. Chambers has not shown that Sgt. Roberts's "complaints," conduct at the squad briefing, or "continued public harassment and humiliation" constitute a materially adverse action.  (Doc. 11 ¶¶ 172–76); see Gooden, 679 F. App'x at 968 ("[O]stracism and rudeness by supervisors and co-workers do not rise to the level of an adverse employment action." (quoting Thorn v. Amalgamated Transit Union, 305 F.3d 826, 831 (8th Cir. 2002)).  Indeed, Ms. Chambers does not clearly identify any other discipline or

28

write-up she received, even following Sgt. Roberts's employee incident report against her.  And although she asserts in her response that her placement on "probation" "prevented [her] from seeking pay raises," that assertion is not supported by the evidence.  (Compare Doc. 36 at 2, 10, with Doc. 36-1 at 17, ¶ 118.)[9] As for Ms. Chambers's inability to "transfer," after Ms. Chambers filed her employee incident report against Sgt. Roberts, consistent with protocol for complaints of gender discrimination, Sgt. Roberts was reassigned to the Northeast District and removed from Ms. Chambers's chain of command.  (Doc. 29-10 at 1, ¶ 4; Doc. 29-12 at 2, ¶ 8; Doc. 29-2 at 4, ¶ 14.)  It is thus not clear that an inability to transfer would support a finding of a materially adverse action.

In all events, for reasons explained above, the City has proffered legitimate, non-discriminatory reasons for each of its actions, and Ms. Chambers is unable to show that the reasons are pretextual.  Finally, to the extent Ms. Chambers seeks to raise a retaliation claim based on a "convincing mosaic" method of proof, see Ring, 4 F.4th at 1164, the claim fails for the reasons mentioned above.  See Lewis, 934 F.3d 1169.  Summary judgment in the City's favor is thus warranted on Count III.

---

[9] It is not clear whether the "probation" Ms. Chambers refers to relates to her April 2020 unpaid suspension.  As noted, to the extent it does, Ms. Chambers is unable to show that the City's legitimate, nondiscriminatory reason for the probation is pretextual.

## CONCLUSION

Defendant City of Lakeland's Motion for Final Summary Judgment (Doc. 29) is **GRANTED**.  The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff, terminate any pending motions and deadlines, and close the file.

**ORDERED** in Tampa, Florida on June 30, 2022.

**JOHN L. BADALAMENTI**
UNITED STATES DISTRICT JUDGE